DEBRA P., a minor, by Irene P., her mother and next friend, Wanda W., a minor, by Ruby W., her mother and next friend, Luwanda K., a minor, by Willa K., her mother and next friend, Terry W., a minor, by Doris W., his mother and next friend, Brenda T., a minor by Willie T., her father and next friend, Vanessa S., a minor, by Mamie S., her mother and next friend, Thomas J. H., Jr., a minor by Thomas J. H., Sr., his father and next friend, Gary L. B., a minor, by Ezell B., his father and next friend, Valisa W., a minor, by Charles W., her father and next friend, Huey J., a minor, by Melvin G., his guardian and next friend, on behalf of themselves and all other persons similarly situated, Plaintiffs,

v.

Ralph D. TURLINGTON, Individually and as Commissioner of Education, Florida State Board of Education, Governor Bob Graham, Individually and as Chairman thereof, Secretary of State George Firestone, Attorney General Jim Smith, Comptroller Gerald A. "Jerry" Lewis, Treasurer William Gunter, Commissioner of Agriculture Doyle Conner, Commissioner of Education Ralph D. Turlington, all Individually and as members thereof, Florida Department of Education, School Board of Hillsborough County, Florida, a Corporate Body Public, Roland H. Lewis, Individually and as Chairman thereof, Cecile W. Essrig, Carl Carpenter, Jr., Ben H. Hill, Jr., A. Leon Lowery, Sam Rampello, and Marion Rodgers, all Individually and as members thereof, and, Raymond O. Shelton, Individually and as Superintendent of Schools of Hillsborough County, Defendants.

No. 78–892 Civ. T–C.

United States District Court, M. D. Florida, Tampa Division.

July 12, 1979.

As Amended Aug. 7 and 8, 1979.

Morris W. Milton, St. Petersburg, Fla., Stephen F. Hanlon, Robert J. Shapiro, Bay Area Legal Services, Tampa, Fla., Diana Pullin, Roger L. Rice, Richard Jefferson, Center for Law and Education, Cambridge, Mass., Terry L. DeMeo, Legal Services for Greater Miami, Miami Fla., for plaintiffs.

James D. Little and Judith A. Brechner, State Board of Education, Tallahassee, Fla., W. Crosby Few, Tampa, Fla., for Hillsborough County defendants.

## MEMORANDUM OPINION

CARR, District Judge.

### I

### THE CLAIMS AND CLASSES

The Plaintiffs in the instant action present a broad based constitutional and statutory challenge to the Florida Functional Literacy Examination (i. e. State Student Assessment Test, Part II; hereinafter referred to either as the SSAT II or the functional literacy examination). Fla.Stat. § 229.57, *et seq.* Plaintiffs contend in a complaint filed October 16, 1978, that the SSAT II violates their Fourteenth Amendment due process and equal protection rights and also violates their rights pursuant to 42 U.S.C. § 2000d and 20 U.S.C. § 1703.

The Court on March 21, 1979, certified three classes of Plaintiffs:

*Class A* are all present and future twelfth grade public school students in the State of Florida who have failed or who hereafter fail the SSAT II.

*Class B* are all present and future twelfth grade black public school students in the State of Florida who have failed or who hereafter fail the SSAT II.

*Class C* are all present and future twelfth grade black public school students in Hillsborough County, Florida who have failed or who hereafter fail the SSAT II.

The Defendants in the case are Commissioner of Education, Ralph D. Turlington, the Florida Board of Education, Governor Bob Graham, Secretary of State George Firestone, Attorney General Jim Smith, Comptroller Gerald A. Lewis, Treasurer William Gunter, Commissioner of Agriculture Doyle Conner,[1] the Florida Department of Education [hereinafter referred to as the DOE], the School Board of Hillsborough County, Florida, Roland H. Lewis, Cecile W. Essrig, Carl Carpenter, Jr., Ben H. Hill, Jr., A. Leon Lowery, Sam Rampello, Marion Rodgers,[2] and Superintendent of Schools of Hillsborough County, Raymond O. Shelton.

A brief summary of the Plaintiffs' claims in conjunction with the certified classes will facilitate an understanding of the Court's opinion.[3] The first claim asserts that the

---

1. The preceding named individual Defendants are the members of the Florida State Board of Education (i. e. the Governor and Florida Cabinet).

2. The preceding named individual Defendants through Mr. Lewis are the members of the Hillsborough County School Board.

3. A more extensive and analytical review of the Plaintiffs' claims is presented in Parts IV, V and VI.

Defendants have either designed or implemented a test or testing program (i. e., SSAT II) which is racially biased and/or which violates the equal protection clause of the Fourteenth Amendment, 42 U.S.C. § 2000d, and 20 U.S.C. § 1703. The first claim relates to Classes A, B and C.

The second claim contends that Defendants have instituted a program of awarding diplomas without providing the Plaintiffs with adequate notice of the requirements (i. e., passage of the SSAT II) or adequate time to prepare for the required examination in violation of the Fourteenth Amendment. The second claim, like the first, relates to Classes A, B and C.

The third claim asserts that the Defendants have used the SSAT II in conjunction with Fla.Stat. § 236.088 as a mechanism for resegregating the Florida public schools through the use of remedial classes for those students failing the examination in violation of the Fourteenth Amendment, 42 U.S.C. § 2000d, and 20 U.S.C. § 1703. The third claim relates to Classes B and C.

The Plaintiffs' prayer for relief seeks a declaratory judgment finding that the requirement for passage of the SSAT II as a prerequisite for a normal graduation diploma is a violation of the due process and equal protection clauses of the Fourteenth Amendment, 42 U.S.C. § 2000d and 20 U.S.C. § 1703. The Plaintiffs additionally request an injunction restraining the Defendants from requiring SSAT II passage as a prerequisite to receiving a high school diploma. Finally, Plaintiffs seek an injunction to both purge their scholastic records of any acknowledgement of the SSAT II failure and to issue an Order prohibiting the utilization of the SSAT II results as a means of structuring classes in remediation.

## II

### JURISDICTION

The Court has jurisdiction to consider the Plaintiffs' claims pursuant to 28 U.S.C. § 1343(3) and (4) and 28 U.S.C. §§ 2201, 2202.

## III

### HISTORICAL AND LEGISLATIVE BACKGROUND

#### A. THE TEST

In 1976, the Florida Legislature enacted a comprehensive piece of legislation known as the "Educational Accountability Act of 1976." *Laws of Florida 1976*, Vol. 1, Chapter 76–223, pp. 489–508. Part of the stated intent of the legislature was:

(a) [to p]rovide a system of accountability for education in Florida which guarantees that each student is afforded similar opportunities for educational advancement without regard to geographic differences and varying local factors . . . (d) [to g]uarantee to each student in the Florida system of public education that the system provides instructional programs which meet minimum performance standards compatible with the state's plan for education . . . (f) [to p]rovide information to the public about the performance of the Florida system of public education in meeting established goals and providing effective, meaningful and relevant educational experiences designed to give students at least the minimum skills necessary to function and survive in today's society. Fla.Stat. § 229.-55(2)(a), (d), (f).

In a subsection of the Act entitled "Pupil Progression" the legislature established three standards for graduation from Florida public high schools. Fla.Stat. §§ 232.-245(3) (1977); 232.246(1)–(3). The first requirement mandated that the students complete the minimum number of credits for graduation promulgated by their school board. The second requirement made compulsory the mastery of basic skills and the third required "[s]atisfactory performance in functional literacy as determined by the State Board of Education . . .." Fla. Stat. § 232.245(3) (1977). The pupil progression subsection also provided that each school district must develop procedures for remediation of students who were unable to meet the required standards. The legislation also provided for a comprehensive testing program to evaluate basic skill development at periodic intervals. Fla.Stat. § 229.-

57.[4] In 1978, the Act was amended by the Florida Legislature to require passage of a functional literacy examination prior to receipt of a state graduation diploma. Those students who completed the minimum number of required high school credits but failed the functional literacy examination would receive a certificate of completion. Fla.Stat. § 232.246.[5]

At the time of trial the SSAT II had been administered on three separate occasions: Fall, 1977; Fall, 1978; Spring, 1979. A review of the results of the three administrations will be discussed in the following section.

## B. THE TEST RESULTS

A review of the results of the October, 1977, administration of the SSAT II indicates that there were substantial numbers of students who failed the test. Of the 115,901 students taking both sections of the test, approximately 41,724 or 36% failed one or both sections. A breakdown of the results on a racial basis shows that 78% of the black students failed one or both sections as compared to 25% of the white students. On the communications section of the SSAT II, 26% of the black students failed as compared to 3% of the white students.

The second administration results followed a similar pattern. Of the 4,480 black students taking the test for a second time, 3,315 or 74% failed one or both sections. The percentage of failure among white students retaking both sections was 25% or 1,675 students. Of the 13,345 black stu-

---

4. Fla.Stat. § 229.57 provides:
   (1) Statewide Testing.—The primary purpose of the statewide testing program is to provide information needed for state-level decisions. The program shall be designed to:
   (a) Assist in the identification of educational needs at the state, district, and school levels.
   (b) Assess how well districts and schools are meeting state goals and minimum performance standards.
   (c) Provide information to aid in the development of policy issues and concerns.
   (d) Provide a basis for comparisons among districts and between districts, the state, and the nation, when appropriate.
   (e) Produce data which can be used to aid in the identification of exceptional educational programs or processes.
   (2) The Statewide Assessment Program.—The Commissioner is directed to implement a program of statewide assessment testing which shall provide for the improvement of the operation and management of the public schools. The statewide program shall be timed, as far as possible, so as not to conflict with on going district assessment programs. As part of the program the commissioner shall:
   (a) Establish, with the approval of the state board, minimum performance standards related to the goals for education contained in the state's plan, including, but not limited, to basic skills in reading, writing and mathematics. The minimum performance standards shall be approved by April 1 in each year and they are established, for a period of no less than three, nor more than five, years.
   (b) Develop and administer in the public schools a uniform, statewide program of assessment to determine, periodically, educational status and progress and the degrees of achievement of approved minimum perform-

ance standards. The uniform statewide program shall consist of testing in grades 3, 5, 8, and 11 and may include the testing of additional grades and skill areas as specified by the Commissioner.

5. Fla.Stat. § 232.246 provides: General requirements for high school graduation.—
   (1) Beginning with the 1978–1979 school year, each district school board shall establish standards for graduation from its schools which shall include as a minimum:
   (a) Mastery of the minimum performance standards in reading, writing and mathematics for the 11th grade, established pursuant to ss. 229.565 and 229.57, determined in the manner prescribed by rules of the state board; and
   (b) Demonstrated ability to successfully apply basic skills to everyday life situations as measured by a functional literacy examination developed and administered pursuant to rules of the state board; and
   (c) Completion of a minimum number of academic credits, and all other applicable requirements prescribed by the district school board pursuant to s. 232.245

   .    .    .    .    .

   (3) A student who meets all requirements prescribed in subsection (1) shall be awarded a standard diploma in a form prescribed by the state board; provided that a school board may, in lieu of the standard diploma, award differentiated diplomas to those exceeding the prescribed minimums. A student who completes the minimum number of credits and other requirements prescribed by paragraph (1)(c), but is unable to meet the standards of paragraph (1)(a) or paragraph (1)(b), shall be awarded a certificate of completion in a form prescribed by the state board.

dents being reexamined on the mathematics section 46% or 6,139 failed.

The results of the third administration of the SSAT II which were released during the trial illustrate the same disparity in the failure rates among white and black students. Sixty percent (60%) of the black students retaking the mathematics section of the test for a third time failed as compared to 36% of the white students. Between October, 1977, and May, 1979, the number of students who were in Florida public high schools first as juniors and then as seniors had been reduced to 91,000 students. Of the approximately 91,000 high school seniors, 3,466 or 20.049% of the black students had not passed the test compared to 1,342 of 1.9% of the white students. The failure rate among black students was approximately 10 times that among white students. In all, approximately 5,300 students or 5.8% had failed to pass the SSAT II by the time of the end of their senior year in high school.

## C. THE EFFECTS

Rather than following a specific item by item format for the findings of fact, the Court will utilize a narrative approach. The Court notes that in resolving conflicts in the testimony it relied upon its evaluation of the witnesses and their demeanor while testifying.

The denial of a standard diploma based on the failure of the SSAT II triggers a number of economic and academic deprivations. The State of Florida Career Service Department, for instance, employs only 10% of its labor force from those people who do not have high school diplomas. The jobs found in this 10% "no diploma" category have been described as both "menial" and "dead end" positions. The State of Florida

requires only a high school diploma for another 10% of its work force. The remaining 80% of the jobs in state government require a high school diploma and experience or some higher academic degree. A certificate of completion will not be considered a diploma for purposes of employment with the State of Florida.

Similarly, admission to one of the nine universities in Florida is predicated upon receipt of a high school diploma. A certificate of completion will not be considered an adequate substitute for the diploma. The denial of a diploma has a disproportionate effect on the college attendance of black students.[6]

The stigma which results from the failure of the SSAT II is a very serious problem. Students who have failed the test are often branded with the label "functionally illiterate."

## D. ADMITTED FACTS AND JUDICIAL NOTICE

Prior to the commencement of the trial, the parties agreed that certain facts need not be proved. A list of those facts is contained in the parties' pretrial stipulation filed April 23, 1979. Those facts pertain primarily to the statutory duties and responsibilities of the Florida State Board of Education and the Florida Department of Education. There is agreement as to the existence of a dual school system in Florida, although the agreement is without temporal boundaries, and as to the fact that historically black children have not fared well on standardized tests in Florida schools.[7]

The Court on the first day of trial took judicial notice of certain relevant facts, statutes, and judicial decisions. The majority of the matters which Plaintiffs request-

---

6. The evidence provided by Dr. Eckland clearly illustrates that large numbers of black students who graduate in the lowest two deciles of their high school classes go on to participate in higher education if they have a diploma. The black students in the lowest two deciles roughly correlates to those black students who failed the SSAT II. Dr. Eckland's review of the National Longitudinal Study showed that the denial of a diploma to the black students in Florida who failed the SSAT II upon the second administration would result in a 20% decline in black students college attendance.

7. Numerous other facts have been admitted which if relevant, will be discussed in the Section IV, V and VI of this Memorandum Opinion. Further recitation of those facts in this section is unnecessary.

ed that the Court judicially notice were previously admitted by the Defendants.[8] The Court has specifically taken judicial notice both of the de jure segregation of Florida schools in the period 1885 to 1967 and that as a result of attending segregated schools prior to the implementation of unitary school systems many members of Classes B and C received an unequal education to that received by white students during those years. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

## E. RACIAL DISCRIMINATION AND FLORIDA PUBLIC EDUCATION (1885–1967)

Although the Court's principal focus concerning racial discrimination in Florida public education revolves around the period 1967–1979, and more specifically 1967–1971, it is helpful to provide a historical over-view of the conditions existing prior to 1967.[9] From 1890 to 1967 Florida public education operated a dual school system; dual in the sense that there were two complete and separate school systems for black and white Florida public school children. *See Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1969). Likewise, there was absolute segregation of school faculty on a racial basis. Black and white teachers even maintained separate professional associations and unions. The physical facilities, the size and scope of the curricula, the libraries, the duration of the school day and year, the supplies, and the texts in black schools were inferior to those in white schools. Black schools during this period were obviously inferior.[10] The dual school system and its inherent inequality was perpetuated not only by the policies and practices of local school boards, but also by the Florida Constitution and statutes.[11] Although the Supreme Court's holding of separate but equal was the law of the land during the bulk of this period, the corresponding component of equality was constantly overlooked and never enforced in relation to black Florida public schools. *Plessy v. Ferguson*, 163 U.S. 537, 168 S.Ct. 1138, 41 L.Ed. 256 (1896).

## IV

## FIRST CLAIM

### A. INTRODUCTION

■ The Plaintiffs' first claim is a multi-pronged equal protection, Title VI and Equal Educational Opportunities Act challenge to the SSAT II. The essence of the claim is the Plaintiffs' contention that SSAT II perpetuates and reemphasizes the effects of past purposeful discrimination. Beyond this core allegation, Plaintiffs contend (1) that the test is unreliable, invalid and not correlated to the public school curriculum, (2) that the test instrument is racially biased, and finally (3) that passage of the test was not required for graduation in Florida private schools. Plaintiffs further contend that the higher percentage of black twelfth grade failures was the probable and foreseeable consequence of enactment and

---

8. The Court's colloquy on the record with counsel as to those matters is clear as to which facts were admitted and which were judicially noticed. *See also* Parties' Pretrial Stipulation.

9. The Court at the commencement of trial specifically limited the focus of the inquiry into discrimination to the period 1967 to present, but permitted Plaintiffs to present expert opinion evidence regarding an overview of the history of discrimination in the Florida public schools.

10. On this issue, the Court cannot help but refer to Judge Heebe's statement in a case involving similar issues:

> It becomes readily apparent to anyone familiar with the nature of white and black schools in the South that children going to the white school would be provided with better facilities, faculties, educational materials than their counterparts in the black schools. *Moses v. Washington Parish School Board*, 330 F.Supp. 1340, 1345 (E.D.La.1971).

11. *See* Paragraphs 9 to 16 in Plaintiffs' Proposed Request for Judicial Notice. These matters were admitted by the Defendants.

implementation of the statutory scheme by the Defendants.

## B. RACIAL DISCRIMINATION AND FLORIDA PUBLIC EDUCATION (1967–1971)

All three classes of Plaintiffs embarked upon their public school educations in the school term 1967–1968. The testimony has clearly indicated that almost all of the Plaintiffs attended segregated public schools which were part of the dual school alignment of the earlier period. While the expert witness testimony on this issue confirms the existence of segregated schools in Florida on a broad geographic scale, the Plaintiffs have placed special emphasis on Hillsborough County, Florida. A review of the appendix to Judge Krentzman's Opinion in *Mannings v. The Board of Public Instruction of Hillsborough County, Florida*, No. 3554 Civ. T–K (unpublished opinion, May 11, 1971) [12] illustrates the attendance during 1967–1971 by race at selected Hillsborough County public schools. The evidence is clear and convincing that Hillsborough County schools in the period 1967–1971 were uniformly racially segregated and that a unitary school system did not exist during that period. This finding is applicable to the state as a whole during the same period.

In *Brown v. Board of Education*, the Supreme Court held:

> We conclude that in the field of public education the doctrine of 'separate but equal' has no place. Separate educational facilities are inherently unequal. Therefore, we hold that the Plaintiffs and other similarly situated for whom the actions have been brought are, by reason of the segregation complained of, deprived of equal protection of the laws guaranteed by the Fourteenth Amendment. *Brown, supra*, 347 U.S. at 495, 74 S.Ct. at 692.

Thus, it is clear that the separate facilities in Florida public schools for white and black children during the period 1967–1971 violated Plaintiffs' equal protection rights under the Fourteenth Amendment. The *Brown* finding that separate facilities were inherently unequal is manifestly applicable. [13]

Beyond the question of inherent inequality due to segregation is the question of the inferiority of black schools during the same period. While Plaintiffs contend that a *Brown* showing which has been made is sufficient to shift the burden to Defendants, the Plaintiffs produced vast amounts of evidence of the inferiority in fact of black schools during the period 1967–1971. The evidence clearly indicates that black public schools in Florida were inferior in their physical facilities, course offerings, instructional materials, and equipment. There is little doubt but that the pervasive racial isolation condemned in *Brown* [14] in conjunction with the inferiority of black schools created an atmosphere which was not as conducive to learning as that found in white schools. [15] Further, this education-

---

**12.** Although Judge Krentzman's Opinion in *Mannings* has been often cited as a model decision in the area, it was never published. In *Mannings v. Board of Public Instruction of Hillsborough County, Florida*, 427 F.2d 874 (5th Cir. 1970), the Fifth Circuit reversed Judge Lieb's desegregation order and held:

> We proceed to a determination of the status with respect to each of the six essential elements which go to disestablish a dual school system. Tested in this frame of reference, we find the Hillsborough system deficient in student assignments to certain schools, and to a degree in faculty and staff assignment throughout the system. *Mannings, supra* at 876.

The Fifth Circuits finding above was made on May 11, 1970, exactly one year before Judge Krentzman's final desegregation Order was entered. *See also Mannings v. Board of Public*

*Instruction of Hillsborough County, Florida*, 277 F.2d 370 (5th Cir. 1960).

**13.** *See* Plaintiff's "Request for Court to take Judicial Notice of Facts," No. 23, filed April 20, 1979. The Court at the commencement of trial in light of *Brown* and with the substitution of the word "unequal" for the word "inferior" took judicial notice of Request No. 23. While *Brown* made an inherent inequality finding, Judge Krentzman in *Mannings* found factual inequality in Hillsborough County Schools.

**14.** *Brown, supra* note 11, at 494, 74 S.Ct. 686.

**15.** The Defendants at trial attempted to illustrate that at least one white school was older, or more in need of repair, than a black school. The inequality of only one school vis-a-vis only one other school is not the issue in this case.

al environment constituted a serious impairment to Class B and C Plaintiffs' ability to learn, especially in the early grades which most educators view as a formative stage in intellectual development.[16]

## C. THE TRANSITION PHASE (1971–1979)

By the commencement of the school term 1971–1972, the actual physical integration of Florida public schools was generally completed. With integration came a host of human problems. Although children of all races suffered in the initial years of integration, black children suffered to a greater degree. The most significant burden which accompanied black children into the integrated schools was the existence of years of inferior education. Plaintiffs in Classes B and C had attended segregated schools which were inferior for the first four years of their education. Other problems presented to black children were disparate busing schedules, lingering racial stereotypes, disproportionate terminations of black principals and administrators, and a high incidence of suspensions. While the problems enumerated above do not constitute the denial of an equal educational opportunity during this period, they do attest to the difficulty in making significant academic gains. Additionally, the state during part of this period did not offer the leadership or the funding to mount a wide-scale attack on the educational deficits created during segregation. Remediation with specifically delineated objectives and programs did not commence until 1977.

Black children in the period after segregation ended were presented with numerous problems. Not only did the Class B and C Plaintiffs have to adjust to social, cultural and linguistic differences of the integrated schools, but they had to do so without an adequate educational foundation. The vestiges of the inferior elementary education they received still are present and affect their performance. Although remediation is now underway in a meaningful sense, the effects of past purposeful segregation have not been erased or overcome.

## D. THE INTENT TO DISCRIMINATE

While *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1977), is instructive that disproportionate impact is "not the sole touchstone of invidious racial discrimination forbidden by the Constitution", it is a relevant factor to be considered. *Id.* at 242, 96 S.Ct. at 2049. The disproportionate impact of the diploma sanction on black school children imposed by failure of the SSAT II is clear. *See Castaneda v. Partida*, 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). The results of the first administration of the SSAT II in October, 1977, indicated that 77% of the black students taking the mathematics section failed that portion of the test compared to only 24% of the white students. While numerically less students failed the communication section of SSAT II, the percentage of failure among black students was eight times that of white students (i. e. 26% black failures compared to 3% white failures).

The results of the second administration of SSAT II in October, 1978, followed a similar pattern. The percentage of failure among black students was greatly disproportionate to white students. The third and final SSAT II administration results indicated that three times as many black students failed as white students. Since black students comprise approximately one-

---

The class action proportion of the instant suit has forced the Court to view the relative quality of the black and white schools from a very broad perspective.

**16.** *See* Fla.Stat. § 230.2311:

(1) The Legislature recognizes that the early years of a pupil's education are crucial to his future and that mastery of the basic skills of communication and computation is essential to the future educational and personal success of an individual. . . . Early childhood and basic skills development programs shall be made available by the school districts to all school age children, especially those enrolled in kindergarten and grades one through three, and shall provide effective, meaningful, and relevant educational experiences designed to give students at least the minimum skills necessary to function and survive in today's society.

fifth of Florida public schools, the ratio of black to white failures based on the percentage of population is 10 to 1. Approximately 20% of black students who have taken the test three times have not passed as compared to 1.9% of the twelfth grade white students.

As discussed previously, the policies and practices of local school boards together with the Florida Constitution and statutes attest to the intentional creation and maintenance of a dual school system in Florida. Until the school term 1971–1972, the condition of segregated schools persisted throughout the state. The intent to discriminate in the period 1967–1971 has clearly been identified.

In addition to the evidence of past intent, the Plaintiffs presented evidence relative to present intent. Numerous witnesses who were Florida Department of Education employees testified that they anticipated a high percentage of black failure on the SSAT II. The Defendant, Ralph Turlington, the Florida Commissioner of Education, acknowledged that he also anticipated a high black failure rate with regard to the implementation of the SSAT II testing program. Defendant Turlington additionally admitted that a certain portion of the black failure must be attributed to the inferior education the Plaintiffs in Classes B and C received during the dual school period.

With *Washington v. Davis, supra*, the Supreme Court commenced the redefinition of intent in discrimination cases.[17] Instead of relying solely on disproportionate racial impact, the Court focused on whether an identifiable discriminatory purpose was present. Noting that the Plaintiffs had not asserted a claim for intentional discrimination or purposeful discrimination, the Supreme Court reversed the lower courts' finding of a constitutional violation. In a concurring Opinion Justice Stevens addressed the type of proof necessary to establish discriminatory purpose.

Frequently the most probative evidence of intent will be objective evidence of what actually happened rather than evidence describing the subjective state of mind of the actor. For normally the actor is presumed to have intended the natural consequences of his deeds. *Id.* 426 U.S at 253, 96 S.Ct. at 2054.

In *United States v. Texas Education Agency,* 564 F.2d 162 (1977), *rehearing denied,* 579 F.2d 910 (5th Cir. 1978), *cert. denied,* —— U.S. ——, 99 S.Ct. 3106, 61 L.Ed.2d 879 (1979) Judge Wisdom addressed the standard for intent after *Dayton Board of Education v. Brinkman,* 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977), *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Washington v. Davis, supra.* Applying the "objective standard" found in *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), Judge Wisdom held that "official decisionmakers would be held to have intended the reasonably foreseeable consequences of their decisions". *Texas Educa-*

---

17. The Court in this section and Section V has reviewed a number of law review articles which have been of considerable assistance. Baldwin and Nagan, *Board of Regents v. Bakke: The All-American Dilemma Revisited,* 30 U.Fla.L.Rev. 843 (1978); Brest, *The Supreme Court, 1975 Term-Forward: "In Defense of the Antidiscrimination Principle,"* 90 Harv.L. Rev. 1 (1976); Lewis, *Certifying Functional Literacy: Competency Testing and Implications for Due Process and Equal Educational Opportunity,* 8 J.L. and Educ. 145 (1979); McClung, *Competency Testing Programs: Legal and Educational Issues,* 47 Fordham L.Rev. 651 (1979); Perry, *The Disproportionate Impact Theory of Racial Discrimination,* 125 U.Pa.L.Rev. 540 (1977); Tribe, *Perspectives on Bakke: Equal Protection, Procedural Fairness or Structural Justice,* 92 Harv.L.Rev. 864 (1979); Vernon, *Due Process Flexibility in Academic Dismissals: Horowitz and Beyond,* 8 J.L. and Educ. 45 (1979); Yudof, *Equal Educational Opportunity and the Courts,* 51 Texas L.Rev. 411 (1973); *Developments in the Law—Equal Protection,* 82 Harv.L.Rev. 1065 (1969); Note, *Reading the Mind of the School Board: Segregative Intent and the De Facto/De Jure Distinction,* 86 Yale L.J. 317 (1976); Note, *Proof of Racially Discriminatory Purpose Under the Equal Protection Clause; Washington v. Davis, Arlington Heights, Mt. Healthy, and Williamsburg,* 12 Harv.C.R.C.L.L.Rev. 725 (1977); Note, *Proving Discriminatory Intent from a Facially Neutral Decision with a Disproportionate Impact,* 36 Wash. & Lee L.Rev. 109 (1979).

*tion Agency, supra* at 167. In the instant case, it is clear that the most significant official decision maker, the Commissioner of Education, Ralph Turlington, foresaw that the effect of the implementation of the SSAT II would result in greatly disproportionate numbers of black failures. Even in the face of actual statistics regarding the number of black failures on the field tests and the early administrations, the Commissioner persisted in his opinion that the diploma sanction should be implemented in the 1978–1979 school term. This opinion was maintained even after the Report of the Task Force on Educational Assessment Program, also known as the McCrary Report.

The Supreme Court in a recent decision, *Personnel Administrator of Massachusetts v. Feeney,* —— U.S. ——, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979), discussed the standard for proof of discriminatory intent in a case challenging a veterans preference statute on equal protection grounds. In rejecting a strict foreseeability test, the Court held

> "Discriminatory purpose," however, implies more than intent as volition or intent as awareness of consequences. *See United Jewish Organizations v. Carey,* 430 U.S. 144, 179, 97 S.Ct. 996, 1016, 51 L.Ed.2d 229 (concurring opinion). It implies that the decisionmaker, in this case, a state legislature, selected or reaffirmed a particular course of action at least in part "because of," not merely "in spite of," its adverse effects upon an identifiable group. *Id.* at ——, 99 S.Ct. at 2296.

In a footnote, however, the Court conceded that inevitability or foreseeability of a consequence has a bearing on the discriminatory intent. *Id.* note 25, at ——, 99 S.Ct. 2282. While foreseeability was by no means dispositive or the touchstone, it was possible to draw inferences from the action where the adverse consequences were clear and obvious. Whether those inferences, if found, could be dispelled by other legitimate interests was critical to the Court's final determination.

Plaintiffs have not asserted that the Florida legislature in creating the Educational Accountability Act was motivated by racial animus. Plaintiffs, though, have contended that the Commissioner of Education and certain members of the DOE had first hand knowledge of the effects of the test on black school children and the obvious linkage of their performance to the inferior education received during segregation. This information was forwarded to the State Board of Education. The adverse consequences were clear to the State Board of Education at the critical stages of the development and implementation of the SSAT II.

The legitimate interest in implementing a test to evaluate the established state-wide objectives is obvious. The minimal objectives established could be continually upgraded and the test could be utilized not only to gauge achievement, but also to identify deficiencies for the purpose of remediation. The legitimate interests in the test program are substantial, but the timing of the program must be questioned to some extent because it sacrifices through the diploma sanction a large percentage of black twelfth grade students in the rush to implement the legislative mandate. While the state Defendants have demonstrated a disregard of the reasons for the disproportionate black failure (i. e. the inferior education received during segregation and the dearth of interim remediation), the Court has not been presented with sufficient proof that the motivation for implementing the program was in *Feeney* terms "because of" the large black failure statistics. [The *Feeney* decision was announced after the trial in this case was completed and neither party addressed the issue of intent beyond that posed in *United States v. Texas Education Agency, supra, Washington v. Davis, supra,* and *Arlington Heights, supra.* The analysis of the instant decision is not affected by *Feeney* beyond the question of intent because the Supreme Court has held that neutral mechanisms (i. e. tests) with discriminatory effects are to be analyzed in the same vein as overtly discriminatory mechanisms (i. e. veterans preferences). *Feeney, supra,* —— U.S. at ——, 99 S.Ct. 2282.] Although the proof of present intent to discriminate is insufficient, the Court is of the opinion

that past purposeful discrimination affecting Plaintiffs in Classes B and C is perpetuated by the test and the diploma sanction regardless of its neutrality.

The Supreme Court on numerous occasions has invalidated facially neutral programs which perpetuate past racial discrimination. *Louisiana v. U. S.*, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965); *Guinn v. U. S.*, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340 (1915). In *Gaston County v. United States*, 395 U.S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969), the Supreme Court held that the use of a literacy test as a method of qualifying voters in North Carolina perpetuated the past denial of equal educational opportunities. Although the decision was premised on the interpretation of the Voting Rights Act of 1965, the Court addressed a number of issues similar to those presented in the instant case. The Supreme Court focused particularly on the history of educational discrimination in North Carolina finding the "historic maintenance of a dual school system, but [also] . . . substantial evidence that the County deprived its black residents of equal educational opportunit[y]". *Id.* at 291, 89 S.Ct. at 1723. In finding "it is only reasonable to infer that among black children compelled to endure a segregated and inferior education, fewer will achieve any given degree of literacy than will their better-educated white contemporaries", the Court held "[I]mpartial administration of the literacy test today would serve only to perpetuate the inequities in a different form". *Id.* at 295, 297, 89 S.Ct. at 1725, 1726. The Fifth Circuit has followed the guidance of the Supreme Court in the perpetuation area. *Kirksey v. Board of Supervisors of Hinds County*, 528 F.2d 536 (5th Cir. 1976), *rev'd en banc*, 554 F.2d 139 (5th Cir. 1977); *Meredith v. Fair*, 298 F.2d 696 (5th Cir. 1962). Several of the recent Fifth Circuit decisions are worthy of close consideration. In *McNeal v. Tate*, 508 F.2d 1017 (5th Cir. 1975), and in *United States v. Gadsden County School District*, 572 F.2d 1049 (5th Cir. 1978), the Fifth Circuit considered the constitutionality *vel non* of ability groupings in public schools.[18] In both cases, the ability groupings, which were derived by teacher evaluation and standardized testing, resulted in a high concentration of white students in the upper division or advanced classes and a high concentration of black students in the lower divisions. The *McNeal* Court focused particularly on the nexus between the inferior education in the dual system and the present ability categorization. Regardless of the fact that the ability groupings fostered segregation, the Court in *McNeal* proceeded with an analysis which, if proved, would legitimize the segregation. The Court stated:

If it does cause segregation, whether in classrooms or in schools, ability grouping may nevertheless be permitted in an otherwise unitary system if the . . . method is not based on the present results of past segregation or will remedy such results through better educational opportunities. *McNeal, supra* at 1020.

. . . The testing rationale of both *Singleton*[19] and *Lemon*[20] would bar the use of this method of assignment until the district has operated as a unitary [school] system without such assignments for a sufficient period of time to assure that the underachievement of the slower groups is not due to yesterday's educational disparities. Such a bar period may be lifted when the district can show that steps taken to bring disadvantaged students to peer status have ended the educational disadvantages caused by prior segregation. *McNeal, supra* at 1020–21.

Florida public schools in the main have been physically unitary since 1971. Although the human problems recounted in a previous section have limited the full appre-

---

18. The Court will address the application of *McNeal* and *Gadsden County* again in Section VI(B) of this Memorandum Opinion relative to the Plaintiffs' allegation that the results of the SSAT II were being used for purposes of resegregation.

19. *Singleton v. Jackson Municipal Separate School District*, 419 F.2d 1211 (5th Cir. 1969).

20. *Lemon v. Bossier Parish School Board*, 444 F.2d 1400 (5th Cir. 1971).

ciation of the benefits of a unitary education, the conditions were not such that the system cannot be called unitary. The Defendants have failed to rebut the fact that the disproportionate failure of Class B and C Plaintiffs on the SSAT II resulted from the inferior education they received during the dual school system portion of their education. Defendants have stressed the third component of *McNeal* and contend the SSAT II, the diploma sanction, and the remediation program will remedy the past effects of discrimination through better educational opportunities. The Defendants emphasized the increase in the percentage of Plaintiffs in Class B and C who have passed the test since its first administration. While the increased passing rate is impressive and Florida teachers and students are to be commended for their achievement, the Court has serious reservations about attaching a constitutional imprimatur to a program which penalizes students who have been denied equal educational opportunity. Certainly the Court wishes that every student could and would pass the SSAT II, but it is not so naive as to assume that there will not be failure regardless of the nature of the test or its takers. Yet failure premised on equal educational opportunities, unaffected by the dual school system of the past is of a completely different genre than that presented in the instant case.

In *Green v. County School Board of New Kent County*, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), the Supreme Court reflected upon the import of *Brown* I and II.

It was such a dual systems that 14 years ago *Brown* I held unconstitutional and a year later *Brown* II held must be abolished; school boards operating [under] such school systems were *required* by *Brown* II "to effectuate a transition to a racially nondiscriminatory school system". *Green* at 435, 88 S.Ct. at 1693.

*Brown* II was a call for the dismantling of well-entrenched dual systems tempered by an awareness that complex and multifaceted problems would arise which would require time and flexibility for a successful resolution. School boards such as the respondent then operating state-compelled dual systems were nevertheless clearly charged with the affirmative duty to take whatever steps might be necessary to convert a unitary system in which racial discrimination would be eliminated root and branch. *Green, supra* at 437–438, 88 S.Ct. at 1694.

After *Green* not only was it necessary to eliminate physical segregation of public schools, but it was also necessary to eliminate the effects of such purposeful discrimination. *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971). The Supreme Court's decisions in *Columbus Board of Education v. Penick*, —— U.S. ——, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979) and *Dayton Board of Education v. Brinkman*, —— U.S. ——, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) confirm the Court's analysis in this regard. The Supreme Court in *Dayton* and *Columbus* focused on past purposeful segregation in public schools and the effects of such action. The reiteration by the Supreme Court of the affirmative duty to remedy the effects of segregative policies and practices announced in *Brown* II and followed in *Green, Swann, Columbus* and *Dayton* is of particular significance. In the instant case, the principal effect of the dual school system was the inferior education given black school children. The evidence indicates that black school children, in the language of *McNeal* "still wear [the] badge of their old deprivation—underachievement". *McNeal, supra* at 1019. The effects of racial isolation and the deprivation of equal educational opportunities are again and again cited by Florida school districts in applications for federal funds for educational remediation. While there has been a substantial, but recent effort to eradicate the learning deficits created during the dual school period, the goals of such programs have not been achieved. The results on three administrations of the SSAT II evidence this fact.

The evidence and the ratios of passage of the SSAT II, both numerically and proportionately, indicate that race more than any

other factor, including socio-economic status, is a predictor of success on the test. The fact that 20% of the black students failed the SSAT II compared to only 1.9% of the white students indicates that peer status has not been achieved. In the Court's opinion, punishing the victims of past discrimination for deficits created by an inferior educational environment neither constitutes a remedy nor creates better educational opportunities. When students regardless of race are permitted to commence and pursue their education in a unitary school system without the taint of the dual school system, then a graduation requirement based on a neutral test will be permitted. The Court must conclude that utilization of the SSAT II in the present context as a requirement for the receipt of a high school diploma is a violation of the equal protection clause of the Fourteenth Amendment, 42 U.S.C. § 2000d, and 20 U.S.C. § 1703. The Court will discuss in a subsequent section the nature and duration of the injunctive relief to be extended to the Plaintiffs in Classes B and C.

## E. THE DEVELOPMENT AND VALIDITY OF THE TEST INSTRUMENT

### 1. Introduction

In this section the Court will consider the manner in which the test was developed and its validity from both a constitutional and professional testing perspective. The Court is considering the claims in this section as they relate to Classes A, B, and C. The Court will additionally address the effects of the public perceptions of the test as opposed to the state's definition and perceptions of the test. Certain related issues, such as curricular validity and whether the tests were equated, will be discussed in Section V.

### 2. Test Development

When the Educational Accountability Act became effective on July 1, 1976, it included a provision which required satisfactory performance on an examination of functional literacy for high school graduation in the school year 1978–1979. Fla.Stat. § 232.-245(3) (1977). Although the State Board of Education (i. e. the Governor and Florida Cabinet) was statutorily authorized to approve of the design of the test, the task of formulating a test of functional literacy fell upon the Florida Department of Education.

At the time of the passage of the legislation, the DOE was presented with a formidable task, that of designing a test to meet the scanty legislative language within the strict time limitations established. While the DOE had been working for some time on state-wide objectives for basic skills, it had not been oriented toward designing a functional literacy test. In fact, the Director of the Student Assessment Section of DOE, Dr. Thomas Fisher, summed up the problem in a letter to Senator Donnell C. Childers:

> It is also apparent that most educators have not thought in terms of functional (i. e. practical or applied) skills for high school students, therefore the Department of Education does not have a preexistent set of functional objectives which may be assessed.
>
> This creates a situation in which we must either create such objectives and then construct matching tests or purchase an existing test thus simultaneously adopting the matching objectives. In other words, in the first case, we define what Florida students should learn and measure it. In the second case, a commercial company tells us what Florida students should learn and this is then measured. Exhibit CT–396.

Soon after this letter, the DOE decided upon objectives for the functional literacy test. Basically, the objectives enumerated in December, 1976, were the practical applications of eleven reading and writing eleventh grade basic skills and thirteen mathematics eleventh grade basic skills. At the same time the objectives were decided upon, the DOE contracted with the Educational Testing Service to draft specific items or questions to match the objectives.

During the period from June, 1976, to February, 1977, the DOE staff was continuing to debate on exactly what "functional

literacy" meant. A final definition was promulgated by the DOE on February 18, 1977.

> For purposes of compliance with the Accountability Act of 1976, functional literacy is the satisfactory application of basic skills in reading, writing and arithmetic, to problems and tasks of a practical nature as encountered in everyday life. Exhibit CT–332.

A slight modification of this definition appeared subsequently in both the State Board of Education Rules and the 1978 amendments to the Educational Accountability Act. *Rules and Regulations of the State of Florida,* Chapter 6A–1.942(2)(a) (1978); Fla.Stat. § 232.246(1)(b) (1978 Supp.).

In March, 1977, the Educational Testing Service provided the DOE with sample items. The DOE at the same time leased several items from another commercial testing company. A field test was conducted in the latter part of March, 1977, in five Florida counties. After the field test, the DOE entered into a contract with the Educational Testing Service to write item specifications from the items or questions previously drafted. An item specification is essentially a blueprint for a particular question which permits an item writer to design numerous questions using the same assessment criteria but with different factual contexts.

The functional literacy examination which was administered in October, 1977, contained 117 questions covering the twenty-four skill objectives. The test is a criterion-referenced examination; that is, one designed to assess whether the taker has a mastery or competence in the particular skills tested. The functional literacy examination was not designed to rank students vis-a-vis other students, although it obviously sorts out passers and failers by use of a cut-score. The test was created to evaluate achievement in those skills which the DOE and the State Board of Education deemed necessary to meet the legislative mandate of functional literacy.

After the initial administration of the functional literacy test, the DOE contracted with National Evaluation Systems to design additional test items. Utilizing the item specifications created by the Educational Testing Center, National Education Systems produced 240 additional test questions in January, 1978. Those items were field tested in the Spring of 1978.

The test and the item specifications are secure documents. The DOE has labored continuously since the creation of the test to make certain that no test is either stolen or reproduced. Although there have been several breaches of the security precautions, the test has remained, except to eleventh and twelfth grade public school students, a well kept secret.

Before discussing the validity issues, the Court must refer to a matter which is at the crux of the controversy between the litigants. The test as legislatively created was to be one of functional literacy. Functional literacy has not been defined in a way which is acceptable to either all educational academicians or the public. The testimony, in fact, indicates that there are at least eleven known definitions of functional literacy. What is functional literacy to one person may not be functional literacy to another person, but it is clear that the term "functional illiterate" has a universally negative inference and connotation. While *"illiteracy"* is itself a negative and impact ladened word, *"functional illiteracy"* further compounds these implications by focusing on the individual's inability to operate effectively in society. The categorizing of an individual without reference to a specific standard can be both detrimental and debilitating without justification. As one of the Plaintiffs' experts commented, students who fail the functional literacy test perceive of themselves as "global failures". Another of the Plaintiffs' experts testified that the biggest flaw in the Florida program was its name alone. The Court is in complete agreement. Beyond the economic and academic implications of failure on the test, the stigma associated with the term functional illiteracy is the most substantial harm presented.

While the Court recognizes this, problem, it cannot be oblivious to the definition of functional literacy provided by the DOE, ratified by the State Board of Education, and legislatively approved. While the meaning of functional literacy is clear to the reader of the amended statute or the Rules of the State Board of Education, it is not to the Florida public. In an attempt to escape the impact of the terminology utilized in the original statute, the State Board of Education adopted a new name for the functional literacy test: the State Student Assessment Test II (SSAT II). Still the test remains the Florida functional literacy examination in the mind of the public and the name change has not dispelled the implications of the original denomination. Regardless of how the public perceives the test, the Court must analyze it from the definition [21] provided by the state in conjunction with the twenty-four objectives.[22] The Court must not permit public perceptions to be the guide for statutory interpretation.

Prior to analyzing the evidence presented concerning the validity of the test, it is critical to understand the applicable legal

---

**21.** *See* Exhibit CT–332, quoted at page 258 *supra.*

**22.** *Rules and Regulations of the State of Florida*, Chapter 6A–1.942(2)(a) (1978) provides:

(2) State Student Assessment Test—Part II (a) . . . The test shall be:

1. Designed to measure the student's ability to successfully apply basic skills to everyday life situations.

2. Composed of two (2) standards, one (1) comprising functional communication skills and one (1) comprising functional mathematics skills, as follows:

(a) Communications.

The student will, in a real world situation, determine the main idea inferred from a selection.

The student will, in a real world situation, find who, what, where, which, and how information in a selection.

The student will, in a real world situation, determine the inferred cause and effect of an action.

The student will, in a real world situation, distinguish between facts and opinions.

The student will, in a real world situation, identify an unstated opinion.

The student will, in a real world situation, identify the appropriate source to obtain information on a topic.

The student will, in a real world situation, use an index to identify the location of information requiring the use of cross-references.

The student will use highway and city maps.

The student will include the necessary information when writing letters to supply or request information.

The student will complete a check and its stub accurately.

The student will accurately complete forms used to apply for a driver's license, employment, entrance to a school or training program, insurance, and credit.

b. Mathematics

The student will determine the elapsed time between two (2) events stated in seconds, minutes, hours, days, weeks, months, or years.

The student will determine equivalent amounts of up to one hundred dollars ($100.00) using coins and paper currency.

The student will determine the solution to real world problems involving one (1) or two (2) distinct whole number operations.

The student will determine the solution to real world problems involving decimal fractions or percents and one (1) or two (2) distinct operations.

The student will determine the solution to real world problems involving comparison shopping.

The student will determine the solution to real world problems involving rate of interest and the estimation of the amount of simple interest.

The student will determine the solution to real world problems involving purchases and a rate of sales tax.

The student will determine the solution to real world problems involving purchases and a rate of discount given in fraction or percent form.

The student will solve a problem related to length, width, or height using metric or customary units up to kilometers and miles, conversion within the system.

The student will solve a problem involving the area of a rectangular region using metric or customary units.

The student will solve a problem involving capacity using units given in a table (milliliters, liters, teaspoons, cups, pints, quarts, gallons), conversion within the system.

The student will solve a problem involving weight using units given in a table (milligrams, grams, kilograms, metric tons, ounces, pounds, tons), conversion within the system.

The student will read and determine relationships described by line graphs, circle graphs, and tables.

standards. The Plaintiffs contend that the test is violative of both the due process clause and equal protection clause of the Fourteenth Amendment. Under the Plaintiffs' due process analysis, if the test were shown to be arbitrary and unreasonable, then the Court would be compelled to invalidate it. *Thompson v. Gallagher*, 489 F.2d 443 (5th Cir. 1973). Similarly, if the test by dividing students into two categories, passers and failers, did so without a rational relation to the purpose for which it was designed, then the Court would be compelled to find the test unconstitutional. *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Lindsley v. Natural Carbonic Gas Co.* 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911). While the Court can find no decision which is directly on point, several recent decisions involving the utilization of tests for employment purposes warrant consideration. In *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court focused on the statutory language in Title VII of the Civil Rights Act to prohibit the utilization of required tests for purposes of employment which have a discriminatory impact if they are unrelated to job qualification or performance. In a case decided solely on constitutional grounds, the Fifth Circuit in *Armstead v. Starkville Municipal Separate School District*, 461 F.2d 276 (5th Cir. 1972) decided that the use of the Graduate Record Examination (GRE) for hiring and retention of high school teachers was unconstitutional. Finding that the GRE scores created an absolute classification of teachers into two categories, those qualified and those unqualified, the Court then proceeded to determine whether the test was a valid and reliable mechanism for making such a decision. In finding that it was not reasonably related to its purpose, the Court held:

> We agree with the lower Court's finding that GRE score requirement was not a reliable or valid measure for choosing good teachers. It was undisputed that the GRE was not designed to and could not measure the competency of a teacher or even indicate future teacher effective-

ness. However, it was established that the cut-off score would eliminate some good teachers. Consequently we find that it has no reasonable function in the teacher selection process. *Armstead, supra* at 280.

■ In the instant case, the Court must determine whether the test utilized was a valid and reasonable measure for dividing students into classifications for the purpose of high school graduation. While the Courts in *Griggs* and *Armstead* concerned themselves with the job relatedness facet of the test, the Court in this case can only be concerned with whether the test reasonably or arbitrarily evaluates the skill objectives established by the State Board of Education. Thus, the Court must not focus on the title of the test or the public perceptions of functional literacy, but rather must analyze the test from the perspective of its objectives and the definition provided by its designers.

Both parties agree that the functional literacy test should have content validity, but they disagree as to whether the test does, in fact, have content validity.

> Evidence of content validity is required when the test user wishes to estimate how an individual performs in the universe of situations the test is intended to represent. Content validity is most commonly evaluated for tests of skill or knowledge; . . .
>
> To demonstrate the content validity of a set of test scores, one must show that the behaviors demonstrated in testing constitute a representative sample of behaviors to be exhibited in a desired performance domain. American Psychological Association, *Standards for Educational and Psychological Tests*, 28 (1974).

The Plaintiffs have persistently contended that the Florida test domain or the boundary for the designated skills or knowledge does not match any definition of functional literacy. While the Court would agree that the domain of the Florida test does not equate with every definition of functional literacy or for that matter with many definitions, it does match the one given by the

DOE and the State Board of Education. It would also appear that the Florida legislature is satisfied with the manner in which the State Board of Education has fulfilled its mandate. The Court is satisfied that the skill objectives of the Florida test are adequately evaluated by the test items and that the test has adequate content validity.

Whether the functional literacy test has or needs to have construct validity is another disputed issue. The Plaintiffs contend that the test must have construct validity and it does not. The Defendants contend that construct validity is not essential for the test, but it has it anyway. A construct is a "theoretical idea developed to explain and organize some aspects of existing knowledge". *Id.* at 29. Certainly "functional literacy" is, in the abstract, like "anxiety" or "clerical ability" a construct. Functional literacy in the instant case, however, is a construct about which only limited hypotheses can be made. The definition of functional literacy provided by the state does not attempt to address and resolve all the many hypotheses which can be made about functional literacy. In the Court's evaluation it need not. Particularly instructive of this fact is a statement found in the construct validity section of the American Psychological Association's Standards covering testing.

> It is important to note in this that the investigation of construct validity refers to a specific test and not necessarily to any other test given the same label. *Id.* at 30.

Thus while other states may design tests of functional literacy, they need not all conceive of functional literacy in the same fashion for their tests to have construct

validity. A construct is always capable of definition and the measure of a test's construct validity is whether the hypotheses made about the defined construct will predict behavior. In the instant case, the Court is satisfied that the Florida test has adequate construct validity.

The Court has also considered the other alleged flaws [23] in the test development and instrument and find them to be without constitutional merit. The educational experts presented by the Plaintiffs have given the Court an education in "state of the art" educational measurement and testing. But the "state of the art" is not to be equated with the constitutional standards for Fourteenth Amendment due process and equal protection review. The Court is of the opinion the functional literacy test bears a rational relation to a valid state interest and thus is constitutional.

## F. TEST ITEMS BIAS

▮ The Plaintiffs contend that the functional literacy test consists of racially biased test questions or items which are less likely to be correctly answered by black students than by white students.

The evidence indicates that the professional testing companies which wrote the items for the functional literacy test reviewed the items for possible racial or ethnic bias. Additionally the DOE staff with the assistance of groups of teachers analyzed the test questions for possible racial bias. The DOE also commissioned a scatter plot analysis of the test to determine the possibility of item bias. While some of the questions do seem to have factual settings unfamiliar to certain racial groups, the

---

**23.** The Plaintiffs mounted a frontal assault upon a number of practices and procedures utilized by the DOE in the design and implementation of the test. Among the flaws asserted and considered were: the failure of DOE to solicit public input into the design of the test and its definition; the drafting of item specifications after the writing of items; the continual use by DOE of definitions of functional literacy extraneous and inconsistent with the official definition; the inadequacy of the research prior to the selection of a cut-score; the questionable research methodology of the Defendants' construct validity study; the failure to follow the APA standards for the design and implementation of tests which affect the lives of the takers in a significant fashion; the failure of DOE to adequately publicize what the test is and its inherent limitations; the inadequacy of the form notice sent to parents and students regarding the interpretations of scores on the test; the reliability of the test. While some of the above mentioned flaws were indeed errors of considerable magnitude, they do not cross either individually or collectively the line between inadequacy and constitutional infirmity.

Court is of the opinion that this distraction is minimal and unpervasive. The Court is not convinced by the Plaintiffs' evidence that the test or any item should be invalidated for racial or ethnic bias.

## G. THE APPLICATION OF THE SSAT II TO PRIVATE SCHOOLS

### 1. Introduction

The Plaintiffs contend that the application of the SSAT II testing program to only public schools is a violation of the equal protection and due process clauses of the Fourteenth Amendment. The Plaintiffs have set forth several arguments in this regard. Plaintiffs in Classes B and C first contend that the application of the test to only public schools creates a racial classification. Because of black students' financial inability to attend private schools, they are unable to escape the effect of the test as readily as many white students. Plaintiffs in all classes contend that the application of the test to only public schools does not bear a rational relationship to the alleged purpose of the legislation. Plaintiffs on this ground assert that the state has an interest in assuring that *all* of its students, not just public school students, receive instruction in basic practical application skills.

### 2. Private Schools in Florida

Private schools in Florida today educate approximately 10% of the school age students. Prior to desegregation, 8% of the school age children attended private schools. This relative increase in attendance at private schools has outpaced the growth of the state population. In 1960, black students composed 4% of the students attending private schools. By 1970, the percentage of black students in private schools had increased to 5%. Thus at present, approximately 95% of the students attending private schools are white. The racial composition of Florida public schools is 20% black students and 80% white students.

### 3. The State Regulation of Florida Private Schools

Florida private schools are regulated only to a minimal degree. The principal form of regulation is found in Fla.Stat. § 229.808 which requires annual registration. The entire registration process consists of filing a form with only four questions: "the name and address of the institution, names of administrative officers, enrollment, and number of teachers." *Id.* at § 229.808(1). The exemptions to the registration act essentially void its limited effectiveness. *Id.* at § 229.808(2). Besides registration, private schools' only other state imposed regulation is that they keep attendance records. Fla.Stat. §§ 232.02, 232.021.

The State of Florida does not regulate any substantive matter affecting education in private schools. There are no regulations regarding instruction in basic skills or in any way mandating a curriculum. The State of Florida does not accredit private schools and does not require them to be accredited by any professional accrediting association. Instruction in Florida private schools need not be in English, in fact, at least ten schools in Dade County which grant diplomas give instruction in Spanish. Additionally, one school in West Florida teaches its students in Urdu (a Pakistani language). A graduation diploma from any Florida private school meets the state's employment criteria for jobs requiring a diploma. Likewise, a diploma from a Florida private school will meet the initial requirement for admission to one of Florida's state universities.

### 4. Constitutionality

The Plaintiffs in Classes B and C have attempted to align race with the financial inability (i. e. lack of wealth) to attend private schools. From this alignment, the Plaintiffs would urge application of strict scrutiny to the legislative decision not to apply the SSAT II to private schools. Such an analysis is constitutionally without merit.

The Supreme Court in *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1978) held that classifications based on

wealth were not constitutionally suspect, thus not requiring strict scrutiny. The ability to attend private schools is clearly affected by the student's or his parents' financial resources. While it is also clear that blacks in America, as a class, are without substantial financial resources, these two categories, wealth and race, do not merge in this instance into one suspect classification. Quite often decisions of legislative or administrative bodies affect certain groups disproportionately. This alone does not signal strict scrutiny. *New York City Transit Authority v. Beazer,* 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979).

■ The legislative decision to apply the SSAT II only to public schools also passes constitutional muster under the rational relation analysis. As the Supreme Court stated in *Ambach v. Norwick,* 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979), "[t]he State has a stronger interest in ensuring that the schools it most directly controls, and for which it bears the cost, are as effective as possible . . . ." *Id.* note 8, 99 S.Ct. at 1595. The state need not correct all the problems of education in one clean sweep, but can attack the problems it identifies in a logical fashion. The decision made in the instant case to apply the SSAT II only to public schools over which the state already had significant curricular, instructional, and financial control was both reasonable and constitutional.

Whether the state could require the taking and passage of the SSAT II for a diploma in private schools and subsidize the cost is not the question presented herein. The Supreme Court will address this issue in its next term. *Committee for Public Education and Religious Liberty v. Levitt,* 461 F.Supp. 1123 (S.D.N.Y.1978) *cert. granted,* 440 U.S. 978, 99 S.Ct. 1785, 60 L.Ed.2d 238 (1979).

V

SECOND CLAIM

A. INTRODUCTION

■ In this section, the Court will consider the allegations of the Plaintiffs in all classes in the second count of the complaint concerning the adequacy of the notice prior to and since the implementation of the functional literacy testing program. The Court will also consider the adequacy of the time to prepare for the examination after the objectives were first established. The Plaintiffs' allegations in this claim state that the schedule imposed by the Defendants violated their Fourteenth Amendment due process rights.

While the Court in Section IV has discussed the development of the test instrument itself, the Court in this section will review the development of the test in relation to the testing objectives, the implementation schedule and the state-wide, in-school instruction. The Court will also consider in this section whether the test instruments were equated.

B. THE TESTING SCHEDULE

In April, 1977, the State Board of Education formally approved the DOE draft of the Minimum Student Performance Standards. The Standards established objectives for instruction in mathematics and communication skills for grades 3, 5, 8 and 11. The functional literacy objectives were derived from eleventh grade basic skills objectives. While there had been considerable in-put from public school teachers during the development of the basic skills objectives, the DOE staff designed all the functional literacy objectives without external assistance. Basically, the DOE staff redesigned twenty-four of the basic skill objectives so that they would present the objectives in practical application contexts. During the summer of 1977, the DOE distributed to all Florida public schools the basic skill and functional literacy objectives. It thus appears that public school teachers were aware of the objectives of the functional literacy examination four months in advance of the first administration of the test, but only two months were available for instruction in the application of the skills. The results of the first administration reflect the obvious inadequacy of the prior instruction in the stated objectives.

From December, 1977, the date the results of the first administration were released, until April, 1979, the date the third and last administration was held, only thirteen months of instructional time intervened. During this period remediation classes for those students who failed were held in almost every Florida county. The DOE had designed instructional materials to assist in the remediation programs, but those materials were not immediately available. During the Spring of 1978, the remediation programs with the assistance of state funds were working effectively. The programs for remediation in most counties are presently on-going and have received additional state funding.

## C. INSTRUCTION IN FLORIDA PUBLIC SCHOOLS

Aside from the questions of the sufficiency of the instruction since the announcement of the functional literacy objectives and the adequacy of the time to prepare for the objectives, the Court must inquire into the instruction of the objectives prior to the implementation of the act. Historically, Florida public education has been administered solely by sixty-seven autonomous county school boards. Each school board controlled the design of the curriculum, the selection of the required textbooks and the establishment of graduation requirements. With local school boards in a controlling position, the interests of the county and their particular region of the state would dictate educational emphasis. The nuances of instruction and objectives would differ greatly between the various counties. The texts used in Florida counties varied a great deal. There was no uniformity as to the selection of instructional materials until very recently. Even now when the DOE approves several texts for use for individual courses in the schools, no one text contains all of the functional literacy objectives. In fact, a review of several texts is necessary for complete instruction in the mathematics or communications functional literacy objectives. After the adoption of the 1968 Florida Constitution, the legislature and the DOE began to play a more centralized role in the education of Florida public school children. The DOE began to plan for basic skill objectives in 1972–1973 and implemented testing programs to evaluate the success of such instruction, but throughout the period of the Plaintiffs' education, the individual counties remained the single most important entities for the design and implementation of instructional programs and the selection of textbooks.

This problem is indicative of a much larger issue. Although there is evidence that certain skills were not taught in Florida public schools, let us assume *arguendo* that all the skills were taught. The atmosphere of the instruction prior to the implementation of the basic skills and functional literacy objectives was neutral and devoid of the present objectives. While all instruction is important, there are obvious methods of motivating students and emphasizing certain skills. The principal problem with the instant program is that the instruction in previous years took place in an atmosphere without the specific objectives now present and without the diploma sanction. Instruction of the skills necessary to successfully complete the functional literacy test is a cumulative and time consuming process. Knowledge of how to successfully perform the functional literacy skills is not taught in any specific grade, in any specific class, or from any specific type of teacher. It is critical that at the time of instruction of a functional literacy skill, the student knows that the individual skill he is being taught must be learned prior to his graduation from a Florida public school. Instruction in the specific skills is critical, but likewise so is identification of whether the skills have been learned. Teaching and learning are not always coterminous. Fla.Stat. § 236.-088. Until recently, there was no state-wide testing program to evaluate learning and to direct remediation.

The Plaintiffs' expert witnesses testified that the principal problem with the testing program was not the diploma sanction or the announcement of state-wide objectives but the implementation schedule. The Court is in agreement that the present pro-

gram of instruction in specific basic skill and functional applications with periodic testing to identify both mastery and deficiencies is a step forward. It sets objectives, defines goals, evaluates achievement and, if necessary, remediates deficiencies. The program acclimates students to standardized testing and will relieve some of the immense pressure when it comes time to take the functional literacy examination. The benefits of the overall program inure differentially to those students who have been in the system for longer periods of time. But as asserted by one of the Plaintiffs' witnesses, "the functional literacy program was a test looking for a plan of instruction".

The Report of Task Force on Educational Assessment Programs, which was appointed by the State Board of Education, summarized the timing problems in the following fashion:

> The problems created by the abrupt schedule for implementing the Functional Literacy Test were most severe for the members of Florida high school graduation class of 1979. At the eleventh hour and with virtually no warning, these students were told that the requirements for graduation had been changed. They were suddenly required to pass a test constructed under the pressure of time and covering content that was presumed to be elementary but that their schools may or may not have taught them recently, well, or perhaps at all.
>
> In retrospect, the Task Force believes that the schedule for implementing statewide high school graduation standards was too severe. We feel that most of the problems that are identified in later sections of this report are the result of trying to do too much in too little time. Consequently, we believe that the problems can and will be solved over time. Task Force on Educational Assessment Programs, *Competency Testing in Florida Report to the Florida Cabinet (Part 1)* 4 (1979).

While the problems identified by the Court and the Task Force are major issues, they are compounded by requiring passage of the functional literacy examination for graduation. If the functional literacy testing program were designed to evaluate skills to aid in remediation alone, then the Court would not find the program suspect in any fashion not already identified. While the Defendants contend the diploma sanction is an essential facet of the program which increases the stimulus to learn and the motivation to achieve, the Plaintiffs contend that the diploma sanction is a punitive measure which is excessive and not the least restrictive manner in which to achieve the goals identified by the state. In *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976), the Fifth Circuit considered the application of due process standards to the denial of an academic degree. In that case the Plaintiff, who was pursuing a graduate degree in education, objected on constitutional and contractual grounds to the university's decision to require a comprehensive examination for receipt of the degree after the commencement of her studies. While the Fifth Circuit reversed the District Court's grant of injunctive relief, it did so on the basis of an analysis of the facts. The Court, in doing so, implicitly acknowledged that termination for academic reasons created a due process right to timely notice.

The Supreme Court in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), decided last term that Charlotte Horowitz, the Plaintiff, who had been terminated from medical school for academic reasons, had been afforded ample due process and refused to require a pre-termination hearing. In support of the constitutional ruling, the Court singled out the manifest problems with the intervention of the judiciary into the realm of academic evaluation. Although the Court in a footnote cited with approval the statement that " '[t]here is a clear dichotomy between the student's due process rights in disciplinary dismissals and academic dismissals' ", the distinction between what the rights of the two classes of individuals are is not clearly and unequivocally drawn.

In *Horowitz* the Plaintiff had been evaluated in her clinical rotations by a number of physicians in addition to having her work supervised and critiqued by her chief docent. The Plaintiff received repeated warnings of her substandard performance and was placed on academic probation by the Council of Evaluation, a group of physicians and medical students who reviewed academic performance. After further review and recommendations the Council of Evaluation decided that the Plaintiff should not be permitted to graduate. This decision was approved by the Coordinating Committee and the Dean of the Medical School and was also sustained by the University's Provost for Health Services. Considering the practical problems with judicial reevaluation of academic performance and the facts relative to Ms. Horowitz's particular case, the Court decided that the Plaintiff had received adequate due process and a pre-termination hearing was not necessary.

The practical problems in *Horowitz* were manifest. Sifting through an individual student's past clinical record, rehashing physician evaluations, and litigating bedside manner were problems foreign to judicial expertise. The factual context in the instant case is very different. The Court is not asked to evaluate an individual student's performance, but to resolve a dispute involving the legislative decision to implement a test which determines graduation from high school with the standard credential, a diploma. While the factual inquiry is considerably different so are the parties. The Plaintiff in *Horowitz* was pursuing graduate education in advanced studies. The Plaintiffs in all classes in the instant case were participating in secondary education required by the state compulsory education law. Fla.Stat. § 232.01 *et seq*. Although some of the Plaintiffs are beyond the sixteen year age limitation in the Florida Statute, the majority of the time they have spent in the Florida public schools was required.

The Court is convinced that the Plaintiffs in Classes A, B, and C have a property right in graduation from high school with a standard diploma if they have fulfilled the present requirements for graduation exclusive of the SSAT II requirement (i. e. successful performance on the SSAT I and completion of the necessary number of credits). *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). The Supreme Court in *Goss* recognized that even the suspension of a student for one day infringed upon the students' property right in attending school. Students in Florida are required to attend school pursuant to the state's compulsory attendance statute. Fla.Stat. § 232.01 *et seq*. Graduation is the logical extension of successful attendance. While the state has redefined in a sense what successful attendance for purposes of a diploma should be, the Court is of the opinion that the SSAT II requirement should be excluded for the same reasons that the notice of the test has been shown to be inadequate. The Court is also of the opinion that the Plaintiffs have a liberty interest in being free of the adverse stigma associated with the certificate of completion. *Wisconsin v. Constantineau*, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971). This stigma is very real and will affect the economic and psychological development of the individual. Although public disclosure of the different graduation credentials did not occur this year, the only reason for this was a settlement between the parties so as to avoid the necessity of the Court hearing preliminary injunction motions during the middle of the trial.

■ Due process has and always will be a flexible standard dependent upon the facts and circumstances of each individual case. *Cafeteria & Restaurant Workers Union v. McElroy*, 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961).

> " '[D]ue process,' unlike some legal rules is not a technical conception with a fixed content unrelated to time, place and circumstances." It is "compounded of history, reason, the past course of decisions." *Id.* at 895, 81 S.Ct. at 1748 (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123,.162, 71 S.Ct. 624, 643–644, 95 L.Ed. 817 (1951)).

The Court finds the facts in the instant case compelling. The Plaintiffs, after spending ten years in schools where their attendance was compelled, were informed of a requirement concerning skills which, if taught, should have been taught in grades they had long since completed. While it is impossible to determine if all the skills were taught to all the students, it is obvious that the instruction given was not presented in an educational atmosphere directed by the existence of specific objectives and stimulated throughout the period of instruction by a diploma sanction. These are the two ingredients which the Defendants assert are essential to the program at the present time. The Court is of the opinion that the inadequacy of the notice provided prior to the invocation of the diploma sanction, the objectives, and the test is a violation of the due process clause.

Since the time of the release of the results of the first test, remediation classes have been attempting to teach the skills. The effectiveness of the remediation programs is somewhat in doubt at the present time because of the failure of the state defendants to carry out equating studies. These studies would have shown the relative degree of difficulty among the three administrations of the functional literacy test. Based on the present evidence it is impossible to determine whether the tests are becoming easier or whether the remediation program is accomplishing its goal. In either event, large numbers of students have not passed the functional literacy test. The evidence indicates that the instruction of functional literacy skills to older students is more difficult, particularly because the unidentified deficiencies of earlier years have become ingrained. The expert testimony upon which the Court has relied indicates that four to six years should intervene between the announcement of the objectives and the implementation of the diploma sanction. While the Court is loathe to interfere in the operations of the Florida public schools, it is compelled to act because of its constitutional obligation. The Defendants had other constitutionally acceptable alternatives such as phased introduction of the objectives in all grades without the diploma sanction and longer term remediation. The Court cannot help but focus on the fact that the present Plaintiffs in all classes have been the victims of segregation, social promotion and various other educational ills but have persisted and remained in school and should not now, at this late date, be denied the diplomas they have earned by mastery of the basic skills and completion of the minimum number of academic credits.

The Defendants are concerned that the momentum, interest, credibility, and support of Florida public education now present will be undermined if the Court finds the test or the implementation schedule invalid. The Defendants are further concerned that they will be without a sanction or deterrent if the Court voids the linkage of the functional literacy test to the diploma. While the denial of the diploma has a certain deterrent value, its application in the instant case would be analogous to asserting that the immediate and indefinite incarceration without a trial of an individual upon the suspicion of the commission of a crime would have a deterrent effect on other potential offenders. No doubt it would. But in our country, the Constitution, including the due process clause, stands between the arbitrary government action and the innocent individual. *St. Ann v. Palisi*, 495 F.2d 423 (5th Cir. 1974). The implementation schedule in effect relative to the functional literacy testing program with the diploma sanction is fundamentally unfair. The Court in Section VIII will discuss the nature and extent of injunctive relief to be extended to all Plaintiffs.

## VI

### THIRD CLAIM

#### A. INTRODUCTION

■ The Plaintiffs in Classes B and C contend in their third claim that the utilization of the SSAT II to classify and group students for remediation pursuant to the Compensatory Education Act of 1977, Fla.

Stat. § 236.088, perpetuates the effects of past purposeful discrimination and resegregates them in violation of the Fourteenth Amendment, 42 U.S.C. § 2000d and 20 U.S.C. § 1703. The Plaintiffs in these classes further assert that the Defendants foresaw that a substantial number of black twelfth grade students would fail the SSAT II and thus would be placed in compensatory education classes with high proportions of black children and low proportions of white children.

## B. RESEGREGATION

The evidence indicates that the compensatory education program for those students who have failed the SSAT II is disproportionately composed of black children. This is attributable to the fact that more black children have failed the SSAT II than white children. The reason for this has been fully explained elsewhere in this Opinion. Although the Court has found in a previous section that the test is valid and reliable, at least for the purpose of identifying certain skill deficiencies, it has also found that the test perpetuates the effects of past purposeful discrimination. The final question, one posed in *McNeal, supra,* and *Gadsden County, supra,* is whether the testing program along with the compensatory education classes, although they cause resegregation of certain classrooms, will remedy the present effects of past discrimination through better educational opportunities.

In addressing this question, the Court must reflect upon the evidence produced upon this issue. While the compensatory education classification results in disproportionate numbers of black children being placed in the classes, the evidence indicates that the pupil alignment in the compensatory education programs is not static. The progression of students out of the compensatory education program seems to be fluid and the increase in the passage percentages evidence the efficacy of the program. Additionally, the compensatory education program constitutes only at most two classes or hours per day. The remainder of the school day is spent in regular classes which do not contain this disproportionate racial composition. The defendants must be constantly wary that the utilization of the SSAT I and II and the compensatory education program do not isolate and stigmatize any children for longer than is necessary to compensate for the identified deficits. Thus far the record is clear that the purpose of the compensatory education program is to assist students and not to resegregate them. The state's obligation to instruct and remediate all students relative to the SSAT II skills has been commenced. The results of the program are encouraging although serious questions concerning equating are still unresolved. The legislature has given the program ample financial support and hopefully it will do so in the future. By the end of the Court's injunction, all students should be ready and able to compete on an equal footing. Thus while the diploma sanction punishes those who suffered under segregation, the compensatory education program assists him. The *McNeal* rationale for permitting the program to exist, regardless of its disproportionate racial composition has been satisfied as to the compensatory education facet, but not by the diploma sanction. Accordingly, the Court finds that there has been neither a constitutional nor a statutory violation because of the utilization of the results of SSAT II as a mechanism for remediation even if the compensatory education classrooms are disproportionately black.

## VII

### CONCLUSION

In 1954 the Supreme Court recognized the essential role of public education in our society.

Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed

forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. *Brown v. Board of Education*, 347 U.S. 483, 493, 74 S.Ct. 686, 691, 98 L.Ed. 873 (1954).

Because of this seminal role, it is critical to *provide* and *administer* education in a manner which comports with our historical and constitutional notions of fairness and equality. Any deviation from this course would seriously affect not only the individual student but our society as a whole. The Court has herein noted several breaches of this fundamental responsibility of government and has been compelled to act. The injunctive relief granted will be of a limited duration, only that time necessary to purge the taint of past segregation and inadequate notice. At the end of the injunctive period, the state will be permitted to pursue its educational policies and goals free of intervention.

## VIII

### DECLARATORY AND INJUNCTIVE RELIEF

Pursuant to the findings in Sections IV D. and V, the Court is of the opinion that declaratory and injunctive relief are both appropriate and proper in the present instance. In a separate Order the Court will declare that Fla.Stat. § 232.-246(1)(b) (1978 Supp.) is, as applied, in the present context a violation of the equal protection and due process clauses of the Fourteenth Amendment. 42 U.S.C. § 2000d, and 20 U.S.C. § 1703. The two remaining requirements for graduation found in Fla.Stat. § 232.246(1)(a) and (c) (1978 Supp.) remain in full force and effect.

In light of the evidence relating to the necessary period of time to orient the students and teachers to the new functional literacy objectives, to insure instruction in the objectives, and to eliminate the taint on educational development which accompanied segregation, the Court is of the opinion that the state should be enjoined from requiring passage of the SSAT II as a requirement for graduation for a period of four (4) years. In the school term 1982–1983, the state will be permitted to utilize the SSAT II as a requirement for graduation. In the interim the SSAT II can be administered as directed by the State DOE to assist in the identification and remediation of the SSAT II skill objectives. The state Defendants will be permitted to retain the SSAT II scores in a fashion consistent with the manner in which the state retains other achievement test scores.

The Court is of the opinion that the present remediation program is not constitutionally or statutorily invalid. The progress of students out of the program and the limited duration of the daily instruction comports with applicable standards.

DONE AND ORDERED in Chambers in Jacksonville, Florida this 12th day of July, 1979.