DEBRA P., a minor by Irene P., her mother and next friend et al., Plaintiffs-Appellees, Cross-Appellants,

v.

Ralph D. TURLINGTON, Individually and as Commissioner of Education et al., Defendants-Appellants, Cross-Appellees.

No. 79-3074.

United States Court of Appeals,
Fifth Circuit.

Sept. 4, 1981.

W. Crosby Few, Tampa, Fla., James D. Little, Gen. Counsel, State Board of Education-Knott Judith A. Brechner, Deputy Gen. Counsel, Tallahassee, Fla., for defendants-appellants, cross-appellees.

Irving Gornstein, U.S. Dept. of Justice, Washington D.C., for amicus curiae U.S.A.

Stephen F. Hanlon, Bay Area Legal Services, Inc., Robert J. Shapiro, Tampa, Fla., Diana Pullin, Center for Law and Education, Roger L. Rice, Richard Jefferson, Cambridge, Mass., Peter M. Siegel, Miami, Fla., for plaintiffs-appellees, cross-appellants.

David Rubin, Stephen J. Pollak, Richard M. Sharp, Washington, D.C., amicus curiae.

* District Judge of the Northern District of Alabama, sitting by designation.

ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

(5 Cir., 1981, 644 F.2d 397).

Before FAY and VANCE, Circuit Judges and ALLGOOD *, District Judge.

PER CURIAM:

A member of the Court in active service having requested a poll on the reconsideration of this cause en banc, and a majority of the judges in active service not having voted in favor of it, rehearing en banc is DENIED.

In dissenting statements from the court's refusal to consider this case *en banc*, two of our brothers have expressed concern about the ramifications of the panel opinion. With great respect for their views but shocked at their misinterpretations, we file this statement in hope of assisting others involved.

Specifically, the panel assigned this matter did *not*:

a. Forbid a state from providing quality education.

b. Decree that the aim of public education is to confer a diploma and not to educate.

c. Find that black children were not ready for quality education.

d. Order any educational requirements (high or low) for a state school system.

e. Inject itself in any way in the curriculum of the state school system.

f. Suggest that black students be treated differently from white students.

To suggest that the panel opinion has somehow found a constitutional right to a diploma in the *absence of an education* is to play word games which we feel are both inappropriate and unfounded. Apparently our dissenting brothers would approve of "social promotions" coupled with a denial of a diploma as complying with the legal requirements of equal educational opportunities within a unitary school system. Even

more distressing is the assumption inherent in the language of the dissents that the black students involved here had not attended class and satisfactorily passed all examinations given in those courses prescribed as necessary for the receipt of a diploma.

What the record in this case clearly establishes and what the panel of this court did hold includes:

a. That a diploma has a unique value in the market place.

b. That the State of Florida requires attendance in school between certain ages.

c. That the State of Florida has established a public school system.

d. That if certain attendance requirements are met and if specified courses of study are satisfactorily completed (passed) —a diploma will be awarded.

e. That mutual expectations are thus created between the state and the students.

f. That *if* a student complies with the established requirements and *if* he or she has satisfactorily passed these required courses of study, there is a property right in the expectation of a diploma.

g. That if a state is going to impose as a condition for receipt of a diploma a functional literacy test over and above whatever tests, examinations or grading requirements exist for specific single classes (world history, business mathematics, etc.), that test must be a fair test of material presented within those required courses of study.

h. That the State of Florida is to be commended for its concern over the quality of the *education* being furnished by its public school system.

i. That the State of Florida may utilize a functional literacy examination for both remedial purposes and as a condition for the awarding of a diploma.

To suggest that the State of Florida has allowed, or that the panel approved, the awarding of a diploma to any child who had received no learning is to misread both the record and the court's opinion.

Before GODBOLD, Chief Judge, and RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, FRANK M. JOHNSON, Jr., HENDERSON, HATCHETT, ANDERSON, and THOMAS A. CLARK, Circuit Judges.

RONEY, Circuit Judge, specially concurring:

It has been two years since the district court decided this case. Both parties appealed from that decision. Neither party has suggested the case be heard by the en banc court. This is sufficient reason for this Court to decline to consider the case en banc, even without considering the record, the issues and all of the matters discussed by my dissenting colleagues, which have neither been briefed nor argued to nonpanel members, and whether or not the dissents have correctly or incorrectly read the panel decision. In this kind of litigation, the parties' decision as to where they next want to attempt to resolve these complex problems is entitled to great deference without the interference of unrequested, judicially forced, prolonged and expensive en banc procedures which could delay any decision from this Court by at least a year. This Court exists to decide cases, to serve the litigants. We do well when we remember that simple fact. The denial of en banc consideration is justified, whatever the merits of the particular matters argued in the dissents and for whatever reasons an individual judge may have voted.

TJOFLAT, Circuit Judge, dissenting:

A panel of this court has held that public high school students have a *constitutionally* protected property interest in receipt of a high school diploma, and that the state may not withhold that diploma, despite a student's inability to pass a functional literacy exam, unless the state can prove that it has taught, and perhaps taught *well, Debra P. v. Turlington*, 644 F.2d 397 (5th Cir. 1981), the material covered on the exam. Thus, this federal court has told the State of Florida that it is *constitutionally* required to award diplomas to students who are functionally illiterate.

Moreover, the panel has held it *constitutionally* impermissible for the State of Florida to presently require the same level of functional literacy from black and white high school students. This constitutional prohibition is to continue until the state demonstrates that racially disproportionate student illiteracy cannot be attributed to the educational deprivations of past racial segregation in the schools. The panel has provided no guidance concerning how the state is to go about proving this negative proposition.

These holdings are obviously of great moment; they will have far-reaching effect throughout the six states of the Fifth Circuit and will signal to all other states the futility of attempting to improve educational systems in the face of federal interventionism. In one blow our circuit has created a mighty disincentive for the pursuit of excellence in education. This case undoubtedly is en banc worthy, and I vigorously dissent from the court's refusal to rehear it.

The panel opinion states the facts of this case clearly. *Debra P.*, at 400. My concern is not with the panel's interpretation of those facts, but rather with both the substantive character and the practical ramifications of the law the panel creates and applies to those facts.

To focus this dissent I will restate briefly the two holdings of the panel that are, in my mind, most problematic. The first holding concerns due process. The panel finds that Florida has created a property interest in the expectation of receiving a high school diploma, and that this property interest is protected by the due process clause. Moreover, despite finding that Florida's functional literacy exam accurately tests basic functional literacy skills, *Debra P.*, at 406, the panel holds that refusing diplomas to students failing the exam will violate the students' due process rights if the exam tests matters not covered in the classroom. According to the panel, an exam covering such matters is fundamentally unfair. I believe this holding is contrary to establish Fifth Circuit precedent and that it flies in the face of the spirit of the Supreme Court case law on students' educational rights.

The second panel holding that poses great difficulty for me concerns the equal protection clause. The record below indicates that the functional literacy test has a disproportionate impact on black students. The panel views the higher incidence of black failure on the exam as linked directly to the unequal education blacks received during the years of racial segregation. Thus, the argument goes, denying a diploma for failure of the literacy exam perpetuates past racial discrimination. Because the state has failed to demonstrate that denying a diploma is necessary to remedy the continuing effects of past discrimination, the state scheme must fall as violative of the fourteenth amendment. I believe this panel holding is a grievous affront to the fundamental principles underlying the landmark case of *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

### The Due Process Analysis

I believe the panel is incorrect in identifying receipt of a diploma as a property interest protected by the due process clause. The panel relies upon *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), to support its discovery of this protected interest, *Debra P.*, at 403, yet *Goss* should not be read to encompass purely academic matters; in *Board of Curators of the University of Missouri v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978), the Supreme Court indicated that the minimum due process requirement of *Goss* is limited to disciplinary determinations that inhibit a student's access to education. *Horowitz* at 87–91, 98 S.Ct. 954–56. The Court, therefore, has distinguished the role a court may play when called upon to interfere with state disciplinary proceedings and its role in reviewing academic decisionmaking in an educational system. Id. Thus, denying *access* to education triggers rigorous due process analysis; denying academic certification does not. Other courts have recognized this distinction, *see Gaspar v. Bruton*, 513 F.2d 843, 850 (10th Cir. 1975), and indeed, I be-

lieve it to be the basis of controlling case law in this circuit.

In *Mahavongsanan v. Hall*, 529 F.2d 448 (5th Cir. 1976), this circuit held that a university's decision to require students to pass a comprehensive examination as a prerequisite to receiving an M.A. degree was a reasonable *academic* regulation. In so holding, this court stressed that educational institutions have "wide latitude and discretion . . . in framing their academic degree requirements." *Id.* at 450. Indeed, the court went on to emphasize that a state educational institution is entitled to modify its rules and regulations "so as to properly exercise its educational responsibility." *Id.* This was so despite the district court's determination, *Mahavongsanan v. Hall*, 401 F.Supp. 381, 383 (N.D.Ga.1975) *rev'd*, 529 F.2d 448 (5th Cir. 1976), unrefuted in the Court of Appeals, that the exam in question tested "abilities and materials which may not necessarily be instructed within the student's program of study." A contrary holding, this court emphasized, could only be explained by confusing "the court's power to review *disciplinary* actions by educational institutions on the one hand, and *academic* decisions on the other hand." *Mahavongsanan*, 529 F.2d at 449. Despite this exhortation, the panel in *Debra P.* has done just that, converting this confused perspective into law. Thus, I am at a loss in attempting to square *Debra P.* with the prior, controlling authority of *Mahavongsanan*.

It follows directly from *Horowitz*, *Bruton* and *Mahavongsanan* that *education*, not receipt of a diploma, is a property interest deserving of rigorous due process protection. To confuse the two is entirely inappropriate, as education is quite distinct from receipt of a diploma. A diploma supposedly signifies attainment of a certain level of academic proficiency. Thus, ideally, a diploma indicates that the state has performed fully its self-assumed duty to provide a student with an education and that the student has been successful in participating in that education. Therefore, as the panel stresses, at 403, a diploma illustrates *successful* progress through one's education. Academic success is not a property

right—the relevant right is to a full and fair opportunity for an education.

By positing a rigorously safe-guarded property interest in receipt of a diploma, the panel has triggered a due process analysis that fails to correspond to the true constitutional character of the student expectation in question. A student's expectation is protectible only insofar as that expectation comports with the reasonable demands of the relevant educational institution. One simply should not be said to have a due process property interest in a diploma absent performance equaling established academic standards, for a student has only a conditional right to a diploma. *Horowitz*. The panel has turned this reasoning on its head, providing rigorous protection for the diploma interest *before* student compliance with purely academic requirements.

Even more troublesome than the identification of the diploma property right, however, is the panel's inquiry into the fundamental fairness of Florida's functional literacy exam. No one contests that the Florida Legislature instituted the functional literacy exam as a diploma prerequisite out of a concern for "the quality of its public educational system." *Debra P.*, at 400. Moreover, as noted earlier, the district court has found and the panel accepts that the examination tests validly the everyday, practical application of the basic functional literacy skills of reading, writing and arithmetic. *Id.* at 406. For example, the exam tests a student's ability to complete an employment application, to "determine the inferred cause and effect of an action," to comparison-shop, to solve problems "involving purchases and a rate of discount," and to demonstrate other skills of undoubted everyday utility. *Debra P. v. Turlington*, 474 F.Supp. 244, 259 n.22 (M.D.Fla.1979). We must recognize, therefore, that Florida is testing fundamental, indeed minimal, intellectual maturation; the test inquires not into abstract academic matters but rather into the ability to apply basic skills in the context of real-life performance situations. We also must recognize that the decision to impose this exam requirement is a clear

articulation of state policy: the Florida Legislature has decided that successful completion of a public high school education necessarily entails achievement of a minimum level of practical literacy. It would be difficult to formulate a more reasonable or more skeletal policy of public education.

With these considerations in mind, I find very disquieting the panel's determination that the exam must be labeled unfair and constitutionally impermissible if Florida fails to demonstrate that it tested material actually taught in each of its classrooms. This holding places a very onerous burden on the state, for it must prove that each and every student sitting for the functional literacy test was taught, and perhaps taught well, *Debra P.*, at 404, each bit of knowledge that plays a role in the examination. One can only hypothesize what threshold of proof the district court, in the absence of adequate direction from this court, will require of the state. Several difficulties are clear, however. First, the state will have to prove that the material covered on the functional literacy exam was taught, and, by definition, taught adequately, while simultaneously justifying an inevitable amount of underachievement on the exam. In effect, the state will have to show that a student's failure to achieve functional literacy after twelve years of public education is not attributable to ineffective instruction. Surely one cannot assert that adequate teaching always produces true learning, yet it is much less self-evident that this disharmony is subject to proof in a court of law.

Second, this imposing theoretical difficulty of proof will be compounded, for the state must carry this burden for every complaining student in the context of each course that student attended. There is great potential for litigation concerning the effectiveness of individual teachers. Will a student be entitled to a diploma simply because one of his teachers "did not cover the whole book in class," *Debra P.*, at 406? How will Florida be able to test students who transfer into the Florida educational system? The potential for litigation is almost endless; the state's burden is oppressive at best.

Third, the nature of the matter tested, functional literacy, belies the reasonableness of the state's burden. As I have stated, to test functional literacy is to test whether a student has absorbed basic skills and, during the process of growth, learned to convert those skills into the attributes of minimum intellectual maturity. One can, with an acceptable degree of error, attempt to measure the teaching of basic skills, but trying to measure the teaching of the process of maturation derived from acquiring those skills is extremely difficult. Under *Debra P.* the state certainly will have to prove the link between teaching and maturation, and will have to validate the methods employed, (potentially in each classroom), to convey the fruits of that linkage to the student.

These few reflections illustrate clearly the message *Debra P.* conveys to the states. That message is that the federal judiciary will create significant disincentives for state efforts to improve the quality of education. To my mind, the barriers the panel places between the State of Florida and achievement of its educational goals can only be characterized as constitutionally unjustifiable. Furthermore, those barriers portend subsequent federal intrusions inhibiting state educational policy. For example, will *Debra P.*'s federally-imposed curricular validity requirement lead to a federally-dictated basic curriculum, or federally-mandated text-book uniformity, thus eliminating the flexibility the states must have in implementing their education programs?

The panel's approach simply paves the way for extremely vexatious litigation, while demonstrating the very intrusiveness into state educational concerns that the Supreme Court has so clearly denounced.

The Supreme Court has recently noted that " 'Judicial interposition in the operation of the public school system of the Nation raises problems requiring care and restraint.... By and large, public education in our Nation is committed to the control of

'state and local authorities.' " *Horowitz*, 435 U.S. at 91, 98 S.Ct. at 955, quoting *Epperson v. Arkansas*, 393 U.S. 97, 104, 89 S.Ct. 266, 270, 21 L.Ed.2d 228 (1968). The Court expresses similar sentiment in the landmark case of *San Antonio School District v. Rodriguez*: "[T]he judiciary is well advised to refrain from imposing on the states inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems . . . ." *Rodriguez*, 411 U.S. 1, 43, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16 (1972). Even the panel acknowledges that

> "[T]he education of the people in schools maintained by state taxation is a matter belonging to the respective States, and any interference on the part of Federal authority with the management of such schools cannot be justified except in the case of a clear and unmistakable disregard of the rights secured by the supreme law of the land."

*Debra P.*, at 403, quoting *Cumming v. Board of Education*, 175 U.S. 528, 545, 20 S.Ct. 197, 201, 44 L.Ed. 262 (1899). In the face of this authority the panel nevertheless insists upon placing itself between the state of Florida and its high school students.

In sum, the panel has misidentified a property interest and consequently has applied an entirely inappropriate, because both incongruent and excessively instrusive, constitutional analysis to the facts of this case. The decision frustrates an admirable state policy decision to require that public school students be literate before they are certified as academically proficient. One need not be proficient to understand that this frustration will be more than temporary. This circuit has given the state a choice between escaping expensive, time-consuming and demoralizing litigation and fighting an expensive two-front war: attempting to improve education while looking over its shoulder to assure that everything possible is being done to prepare for the inevitable onslaught of due process actions founded upon the most arcane of alleged educational deficiencies. *See, e. g.,* *Debra P.* at 406 (evidence in record that "at least one teacher" did not cover an entire textbook in one of his courses). It is not our place to put state idealism to such a test.

In one step the panel has removed the state incentive to provide quality education, for each state attempt to demand academic proficiency will be subject to the same eviscerating analysis used to reject Florida's attempt to demand functional literacy from its public school graduates. We have only ourselves to blame if Florida abandons its present policy and reverts to the old, admittedly deficient system of social promotion, graduation and certification. Moreover, we should not be surprised if other states in this circuit heed the panel's signal and avoid even attempting a reformation of their educational policies. The transitory impact of the state gesture will simply not be worth the subsequent sting of federal interventionism.

### The Equal Protection Analysis

The state of Florida has decided that it will demand equal performance from both black and white students on its functional literacy exam. The panel, in the most paternalistic fashion, has found this race-neutral approach violative of the equal protection clause. Its holding, stated simply, is that the *constitution* prohibits the State of Florida from treating black and white students equally. Besides the inevitable impact this decision will have on black pride and white hubris, it is, in the most fundamental sense, a perversion of the principle of equality enunciated by the high Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

If *Brown* stands for anything, it is that in the educational arena a state must treat black and white students equally. Any inherently unequal educational treatment of the races is unconstitutional racial discrimination of the most nefarious sort. That discrimination is iniquitous because it is the prerequisite for successful state imposition of unequal status—to sanction racially unequal educational achievement is to cripple

and stigmatize, it is forcibly to lock a race of people into a deprived class with cruelly limited horizons and illusory hopes. For me, therefore, it is inexcusably iniquitous to compel the state to certify as academically proficient an avowedly functionally illiterate minority student based on the institutionalized assumption that he cannot be expected to achieve on the same level as white students. Quite simply, it is to celebrate and perpetuate the hollow certification that accompanied black graduation pre-*Brown*.

The record in *Debra P.* demonstrates that the functional literacy exam has a disproportionate impact on blacks. There also is evidence in the record indicating that the higher incidence of black failure may be attributable in significant part to the legacy of the inherently unequal education provided by Florida's previously segregated educational system. When these facts are joined with the construct validity of the literacy exam, they speak volumes. Yet, their message may be put succinctly: at least partly because of racial segregation, black students in Florida are ending their high school years as functional illiterates. The panel has held that the state must give these illiterate students a diploma certifying successful completion of twelve years of public education. This poses a most incongruous resolution of the dilemma. Black students have a right to an equal education. The state has failed to provide that equal education, and thus a significant number of minority students are functionally illiterate. To correct this, Florida established the prerequisite of the literacy exam, coupled with a statutory authorization that "special instruction designed to remedy . . . identified deficiencies," *Debra P.*, at 401 n. 1, quoting Fla. Stat.Ann. § 232.246 (West Supp.1980), be provided to those who demonstrate an inability to pass the examination. Moreover, Florida has decided to hold back a high school diploma until a student does demonstrate literacy, thus providing an added incentive for pursuit of essential skills. To this the panel responds by asserting that Florida has violated the Constitution.

To be in compliance with the fourteenth amendment, the panel asserts, Florida must give illiterate black students a diploma. I can think of no more otiose, worthless equality than this distribution of paper credentials. To deny a student a diploma is, at worst, a regrettable necessity. Under *McNeal v. Tate County School District*, 508 F.2d 1017, 1020 (5th Cir. 1975), I believe the denial of a diploma is a necessary and entirely reasonable means to remedy the evil, indeed, the badge of slavery, which is black functional illiteracy. In the long run, this state decision seems the wise approach, and it is not for us to second-guess the state. Functionally illiterate graduates possessing a diploma may have less trouble than non-diploma holders in initial employment opportunities, but their futures are bleak. Inadequate performance at work, severely limited opportunities for social mobility, every ill that afflicts the illiterate minority individual will be theirs. It is no remedy for these students, disadvantaged at the hands of the state, to be meaninglessly certified. The wrong has been suffered and now it must be corrected. It is no answer to cover the fundamental hurt with an empty equality of form that ignores the underlying substance. Indeed, if anything, this empty equality is the most wicked perpetuation of the legacy of segregation.

Certainly any resolution of this case would be difficult. It will never be easy to try to correct the manifold evils created by generations of racial discrimination. We must however, never lose sight of the fundamental goal of equality. Our duty is to further attempts to eliminate the vestiges of inequality, not to intrude paternally on good-faith state attempts to ensure real educational equality.

To conclude, I simply cannot believe that the fourteenth amendment requires us to force a state to abandon a rational scheme designed to correct the palpable heritage of segregated, inherently unequal education in favor of mandatory state certification of illiterate students. The panel rules that the state must continue to sanction this meaningless graduation until it can demonstrate that disproportionate black student func-

tional illiteracy is "not due to the educational deprivation [of] the 'dual school' years." *Debra P.*, at 408. The state disincentive here is remarkable: how long will it take before the heritage of educational segregation is eradicated? Furthermore, how much litigation will it take before the federal courts determine that *each* school district in the Fifth Circuit, with its unique history and demography, has outlasted the effects of segregation? We have lived too long with the legacy of racial inequality to believe that the effects of history are of short duration. Indeed, they are all-pervasive, and we do a great deal to extend these all-pervasive effects by requiring Florida to give diplomas signifying educational proficiency to black functional illiterates. We perpetuate the cycle; instead of racial hatred generating racially separate and inherently unequal systems, the spirit of federal paternalism has intervened to impose racially unequal standards of educational proficiency within a single school system. Now the inequality is to be imposed under a single roof, yet the affront to basic racial equality is not lessened. And this racial affront is all the more demeaning because it acts as a great deterrent to black student achievement—why strive to achieve if the rubber stamp of academic certification is available to all?

In my mind, these disincentives are real; they will shape the conduct of both educators and pupils to the detriment of society. When it is appropriate for a federal court to exercise jurisdiction, it should strive to further the spirit of equality. Today, we have done just the opposite. The state should be allowed to correct the deficiencies of the

segregated years *immediately* by requiring of black students the equality of performance that is the *only* demonstration of equal respect, and by providing the means for these students to attain the necessary level of performance, as Florida has done here. *Debra P.*, at 400–01 n. 1. It will be in the dignity of certification for *equal* achievement that the proof of social equality is revealed. To mandate anything short of this is to consign the teachings of *Brown* to the realm of mere idealism.

I respectfully dissent.*

HILL, Circuit Judge, dissenting from Court's denial of Petition for Rehearing En Banc.

A majority of the active judges in Administrative Unit B of the court, acting under our rules for the entire court, has voted against rehearing and reconsidering this case *en banc*. I dissent from this action of our court.

This case finds it constitutionally sound—indeed, mandated—that a state continue the pre-*Brown*[1] practice of handing out meaningless high school diplomas to black boys and girls who have not been required to achieve even a minimal education. Our court's refusal to reconsider this case *en banc* can only be premised upon a conclusion, unstated though it be, that those who labored so long and hard to strike down segregated education were not working to achieve quality education for minority race children but sought to deny it to all children.

Specifically, our court has held[2] that:

* This dissent was written and circulated among the judges before the panel entered its order denying rehearing en banc. In entering its order, the panel has chosen to comment on this dissent, and that of my Brother Hill, to the denial of en banc rehearing. This commentary takes the form of an attempted explanation of *Debra P.*, and purportedly is issued "in hope of assisting others" in interpreting the decision. This commentary, however, has no legal implications for the interpretation and application of *Debra P.*; that decision must stand on its own. The commentary of the panel judges has no precedential significance despite its appearance

as well-intentioned judicial gloss. It does, however, cast further doubt upon the wisdom of the denial of en banc consideration—if *Debra P.*, as originally drafted, requires such a thorough-going attempted explanation, further consideration of the case, if only to clarify *with the force of law* its holding, seems appropriate.

1. *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

2. Since the preparation of this dissent, the panel has entered its order denying rehearing. Further, there is added to that order a state-

(1) The Constitution forbids a state from providing quality education to, and requiring a modicum of learning by, the children in its public school system.

(2) The aim of public education must, under law, be to confer a diploma and must not be to provide an education.

(3) By operating a public school system, a constitutionally protected expectation is created in the attendee that he or she will receive a diploma, not an education.

(4) That, at the time of the Supreme Court's decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the black children of this land were not ready for non-segregated education in schools providing a quality education and requiring some minimal level of attainment for graduation.

(5) *Because black children are a part of the student body*, educational requirements of a state school system must be kept at a low level!

None of the teachings of decided cases supports this assault by our court upon the aspirations of the people of Florida for quality education for their children. The goal of the civil rights movement, that minority race children be provided quality education, are frustrated by this holding. The vestiges of segregated education, which handed out public school diplomas to minority race children but did not provide them quality education, are perpetuated. Before this holding became the law of the Fifth Circuit Court of Appeals, careful and full *en banc* reconsideration should have been indulged.

My expression of concern ought not be taken as a whimsical disregard for the serious attention given this case by our court's panel and by Hon. George C. Carr, the district judge whose opinion, *Debra P. v. Turlington*, 474 F.Supp. 244 (M.D.Fla.1979), evidences great care and painstaking consideration. Rather, I seek to express my conviction that the judgment is contrary to law and that its premise is the wrong premise.

The premise accepted by the court, from which the entire syllogistic exercise is derived, is that, in education, the diploma is the thing. The child's expectation that he or she will receive a diploma without having achieved even a minimum degree of education is held to be a constitutionally protected property right. Yet, before *Brown*, the evil that existed was largely that *diplomas* were being awarded to minority race children even though, in "inherently unequal" systems, they were not being afforded *education* equal to that being administered to others. Nowhere does the court consider the real value of an educational system to the pupil—learning. The Supreme Court was not misled by the free and easy award of diplomas. It emphasized the real value of the educational system to the pupil by observing:

> Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recogni-

---

ment by two judges of this court and a senior district judge a writing in the nature of a response to this dissent and to the dissent of Judge Tjoflat. The response undertakes to interpret the panel's opinion.

Assuming without deciding that the panel opinion needs interpretation, its holding for our court does not. Subject to the limited remand discussed in footnote 4 hereafter, the panel opinion affirms the district court's judgment. It is abundantly clear that the district court enjoins the State of Florida from requiring passage of the functional literacy test as a condition for the awarding of a diploma during the next four years. The panel affirms this injunc-

tion forbidding the State from using that test. The interpretation of the panel opinion proffered by two of our judges who were on the panel says that the panel held "That the State of Florida may utilize a functional literacy examination . . . as a condition for the awarding of a diploma." Rehearing en banc being denied, such a reversal of the district court's injunction cannot be accomplished without rehearing and reconsideration by the panel. If the use of this test be not enjoined in this litigation, my concerns are largely put to rest. What I write is upon the assumption that the district court's injunction has been, on appeal, affirmed.

tion of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education.

347 U.S. at 493, 74 S.Ct. at 691.

It is undoubtedly true that the appearance of having been educated may be accomplished by the conferring of a diploma. Nevertheless, if the child has received no learning, even the most emphatic judgment and order of the most diligent court cannot supply it.

The panel's holding makes Mr. Bumble correct.[3] Happily the panel's holding is not the law.

The panel pays lip service to the law: "Neither the district court nor we are in a position to determine educational policy in the State of Florida." At 402. Nonetheless, they conclude that the expectation of receiving a diploma is a property interest protected by the Fourteenth Amendment. This holding enables the panel (and will require all bound by our opinion) to analyze the diploma requirements established by the State of Florida. Specifically, the panel, in affirming the district court, embraces the view that use of the State's functional literacy test even though validated as to content[4] see 474 F.Supp. at 261, and not infected with cultural bias towards minority students, see 407 n. 17, may not be a requirement for graduation under the Constitution of the United States. Today, the court finds a functional literacy test wanting. Tomorrow, the court may find the state's

math requirements are unfair. And the next day, the court may find that history is unnecessary to the high school curriculum or that, its teacher being less than adequate, a history test or examination is unconstitutional. I hope this never comes to pass. The fact remains, however, that the panel has established a constitutional basis for the judiciary to assume the role of state educators.

The panel cites *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) as authority for its intrusion into the State's educational system. *Goss v. Lopez* provides no such authority. Rather, *Goss v. Lopez* simply required "effective notice and [an] informal hearing permitting the student to give his version of the events" before the student could be suspended for ten days and thus denied participation in the learning process for *disciplinary reasons. Id.* at 583, 95 S.Ct. at 740 (emphasis added). Nowhere in its opinion does the Court approve of judicial review of state academic policy. Furthermore, four members of the Court dissented from the limited holding of *Goss v. Lopez* reasoning that "[t]he decision unnecessarily opens avenues for judicial intervention in the operation of our public schools that may affect adversely the quality of education." *Id.* at 585, 95 S.Ct. at 741.

In *Board of Curators, Univ. of Mo. v. Horowitz*, 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1977) the court vigorously refused to sanction judicial intervention into academic decisions.

Academic evaluations of a student, in contrast to disciplinary determinations bear little resemblance to the judicial and administrative factfinding proceedings to which we have traditionally attached a full-hearing requirement. In *Goss*, the school's decision to suspend the students rested on factual conclusions that the individual students had participated in

---

3. "If the law supposes that," said Mr. Bumble ... "the law is a ass, a idiot." C. Dickens, *Oliver Twist*, Ch. 51 (1838).

4. Of course, the panel held that the test "*may* have covered matters not taught in the schools

of the state." At 404 (emphasis in original). One would suppose that on remand this ambiguity in the record could be quickly resolved in favor of the State by testimony from one familiar with the State's high school curriculum.

demonstrations that had disrupted classes, attacked a police officer, or caused physical damage to school property. The requirement of a hearing, where the student could present his side of the factual issue, could under such circumstances "provide a meaningful hedge against erroneous action." *Ibid.* The decision to dismiss respondent, by comparison, rested on the academic judgment of school officials that she did not have the necessary clinical ability to perform adequately as a medical doctor and was making insufficient progress toward that goal. Such a judgment is by its nature more subjective and evaluative than the typical factual questions presented in the average disciplinary decision. Like the decision of an individual professor as to the proper grade for a student in his course, the determination whether to dismiss a student for academic reasons requires an expert evaluation of cumulative information and is not readily adapted to the procedural tools of judicial or administrative decisionmaking.

*Id.* at 89–90, 98 S.Ct. at 954–955. The same logic prohibits a court from reviewing the *graduation requirements* established by a State. Indeed, our circuit has long been of the view that academic decisions should be left to the states and the appropriate educational bodies. *Mahavongsanan v. Hill*, 529 F.2d 448 (5th Cir.1976). In sum, there is a bright line of demarcation between extending minimal due process safeguards to protect a student's access to learning, *see Goss v. Lopez* and using the Due Process Clause to make decisions regarding the quality of education for the State of Florida. *See Horowitz.*

The district court had presented only the difficulties encountered by minority race students said to result from their having attended the first three grades of elementary education in a segregated system. Thus, on this record, the district court merely postponed a quality education for three years. *See* 474 F.Supp. at 269. Of course, a pupil's achievement in an educational system may be affected by home and other social environment outside the classroom.

Upon the principle laid down by this case, may we not expect the assertion that it is unconstitutional to provide and require quality education and achievement as long as the environment outside the classroom is affected by previous segregation in society and in education. In short, this case at least suggests that minority race children shall not be subjected to and afforded quality education until history has been repealed and the fact that there was segregation be no longer a fact. We may hand down judgment after judgment, but we will not alter historical fact.

It has been said that public education has been in decline in recent years. If it is so, it is deplorable. If it is so, it is not difficult to find at least a cause. There is a limit to the time, effort, funds and other resources that state officials and taxpayers can devote to education and related matters. One has but to review litigation in this court during recent decades to obtain an idea of the amount of those limited resources that have been diverted from the process of educating to devious, clever efforts to thwart the teachings of *Brown*. There is evidence in the record in this case that at least one state has now resolved to turn from such untenable frustrations and return to the restoration of quality to its educational system. I submit that the judges of this court, charged in brief after brief and argument upon argument with the destruction of public education, should, judiciously (and personally for what that's worth), rejoice at such a development.

Instead, we endorse the charge levelled against the courts and solemnly find that the Constitution and the law mandate that quality education, since *Brown*, be forbidden.

Subject to the counseling I might have received from the lawyers on rehearing, I am convinced that this is wrong.